## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal Case No. 10-310 (RCL)** |
| | ) | **UNDER SEAL** |
| **ROBERT DION SAVOY,** *et al.,* | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Before the Court are Motions to suppress evidence obtained from the government's interceptions of wire communications made by defendants Eric Scurry [59], Terrence Hudson [77], Robert Savoy [90], Jerome Johnson [105], and James Brown [108]. Upon consideration of the Motions to suppress, the government's opposition [109], Brown's *pro se* filings [123-1, 156-1], Savoy's *pro se* filings [158, 178, 183, 184], the government's response to Brown and Savoy's *pro se* filings [182], the entire record in this case, and the applicable law, the Court will DENY defendants' Motions. The Court will explain its reasoning in the analysis that follows.

## I.    BACKGROUND

In 2009, prompted by renewed violence in the 4200 block of Fourth Street, S.E., Washington, D.C., the Federal Bureau of Investigation's Safe Streets Task Force began investigating the cocaine and crack dealers in that area. Agents and detectives introduced a confidential informant into the area, who made a series of controlled purchases of crack cocaine from Eric Scurry from November 2009 to March 2010. Among the investigative techniques employed by the task force officers was the use of wiretaps and electronic surveillance. Judge Kennedy approved the agents' applications to intercept the following cellular telephone wire

communications: (1) Eric Scurry, telephone number 202-230-7790, from April 2, 2010 to May 1, 2010; (2) Eric Scurry, telephone number 202-230-7790, from May 2, 2010 to May 31, 2010; (3) Terrence Hudson, telephone numbers 301-367-6175 and 571-501-3531, from June 14, 2010 to July 13, 2010; (4) Robert Savoy, telephone numbers 202-609-4333 and 301-379-4379, from July 23, 2010 to August 21, 2010; and (5) Jerome Johnson, telephone number 240-246-4443, from September 13, 2010 to October 12, 2010.

The government first received authorization to intercept Scurry's communications. According to the government, the intercepted communications from Scurry's cellular telephone established that he and Nathan Robinson were distributors of cocaine base in the 4200 block of Fourth Street, S.E. in Washington, D.C.  On the basis of those communications, the government received authorization to intercept the communications of one of Scurry's suppliers, Hudson. According to the government, the interception of Hudson's communications established that he was also a distributor of cocaine base.  This provided the necessary evidentiary foundation to receive authorization to intercept the communications of one of Hudson's primary suppliers, Savoy.  The government says that the interception of Savoy's communications established that he purchased kilograms of cocaine and then redistributed both powder cocaine and cocaine base to others, including Brown.  Savoy's intercepted communications also established that Savoy collaborated with Brown to purchase significant amounts of cocaine and that Brown cooked that powder cocaine into crack cocaine, according to the government.  On the basis of evidence collected from Savoy's intercepted communications, the government received authorization to intercept the communications of one of Savoy's primary suppliers, Johnson.  According to the government, Johnson's intercepted communications and Savoy's intercepted communications established that Johnson supplied Savoy with kilograms of cocaine.

Based on the evidence generated during this investigation, a grand jury issued two indictments on November 29, 2010. The first was against Robert Savoy and Terrence Hudson, charging them both with one count of Conspiracy to Distribute and Possess with Intent to Distribute 500 Grams or More of Cocaine and 28 Grams or More of Cocaine Base, in violation of 21 U.S.C. § 846, and charging each with one count of Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c). The second indictment was against Nathan Robinson, charging him with Possession with Intent to Distribute 28 Grams or More of Cocaine Base, in violation of 21 U.S.C. § 841. On December 15, 2010, the grand jury issued a superseding indictment, combining the two cases, adding Jerome Johnson, Eric Scurry, and Keena Scurry as defendants in the lead narcotics conspiracy count, and increasing the charged narcotics conspiracy amount with respect to cocaine base from 28 grams or more to 280 grams or more. In September 2011, the grand jury issued a second superseding indictment adding James Brown as a defendant to the lead narcotics conspiracy count.

In their motions, Scurry, Hudson, and Savoy argue that the affidavits in support of the government's application for interception of communications on each of their respective telephones did not establish probable cause and did not satisfy the necessity requirements of 18 U.S.C. § 2518(3)(c). Scurry also challenges the affidavits on the basis that they do not meet the "minimization" requirements under Title III. Additionally, Hudson argues that the interception of his communications was not properly authorized. Finally, Savoy and Brown claim that the interception of Savoy's calls was not properly authorized, and argue that the government effectively secured a series of "roving wiretaps" on the cellular phones from which calls were intercepted but did so without receiving the high-level authorization required for such wiretaps by 18 U.S.C. § 2518(11).

## II.    LEGAL STANDARDS

### A. Interception of Wire Communications

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et*

*seq.*, permits a district court to approve an application for the interception of certain wire, oral, or

electronic communications.  An order for the interception of wire or oral communications may

be issued upon a finding that:

> (1) probable cause exists to believe that an individual has committed or is about to
> commit one of certain enumerated offenses; (2) probable cause exists to believe
> that particular communications concerning that offense will be obtained through
> an interception; (3) normal investigative procedures have been tried and have
> failed or reasonably appear to be unlikely to succeed if tried; and (4) probable
> cause exists to believe that the communication facility sought to be wiretapped is
> being used, or is about to be used, in connection with the commission of the
> offenses.

*United States v. Becton*, 601 F.3d 588, 595 (D.C. Cir. 2010) (internal quotations omitted), *citing*

*United States v. Carter*, 449 F.3d 1287, 1292 (D.C. Cir. 2006); *see also* 18 U.S.C. § 2518(3).

### B. Standing

An "aggrieved person"—any person "who was a party to any intercepted wire . . .

communication or [any] person against whom the interception was directed," 18 U.S.C. §

2510(11)—may move to suppress the contents of the wire communication. Id. § 2518(1)(a).  In

order for a defendant to have standing to seek suppression of electronic surveillance evidence,

the surveillance must be "violative of his own Fourth Amendment right to be free of

unreasonable searches and seizures." *Alderman v. United States*, 394 U.S. 165, 176 (1969).

"[T]he prohibition against assertion of another's rights normally would preclude an aggrieved

person from suppressing a conversation in which he did not participate." *United States v. Scott*,

504 F.2d 194, 197 n.5 (D.C. Cir. 1974), *aff'd*, 436 U.S. 128 (1978).  Under this standard, each

defendant has standing to challenge the interceptions of the communications from his own

telephone as well as conversations in which he was a participant that were intercepted during the wiretap of another defendant's telephone. However, a defendant does not have standing to challenge a wiretap in which he was not intercepted or a conversation in which he did not participate.

## C. Probable Cause

18 U.S.C. § 2518(1)(b)(i) requires an application to intercept wire, oral, or electronic communications to include "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including details as to the particular offense that has been, is being, or is about to be committed."

## D. Necessity

In addition to a statement as to probable cause, 18 U.S.C. § 2518(1)(c) provides that each application for an order authorizing a wiretap must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Similarly, prior to granting an order authorizing a wiretap, an issuing judge must find, among other things, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). These prerequisites to a wiretap are commonly known as the "necessity" requirement.

The purpose of the necessity requirement is to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," and to inform the issuing judge of the difficulties inherent in the use of traditional techniques. *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). "This purpose can be achieved . . . only by giving close scrutiny to applications challenged for noncompliance and rejecting generalized and

conclusory statements that other investigative procedures would prove unsuccessful. The Government need show, however, only that other techniques are impracticable under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation." *United States v. Johnson*, 696 F.2d 115, 123 (D.C. Cir. 1982) (internal citations and quotations omitted). Even though merely conclusory statements about necessity will not suffice, "[s]ections of an affidavit framed in conclusory terminology . . . 'cannot rationally be separated from . . . preceding detailed descriptions of . . . investigative events.'" *United States v. Sobamowo*, 892 F.2d 90, 93 (D.C. Cir. 1989) (quoting *United States v. Williams*, 580 F.2d 578, 589 (D.C. Cir. 1978)).

### E. Minimization

The wiretapping statute also requires that "[e]very [wiretap] order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable [and] shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception . . . ." 18 U.S.C. § 2518(5). This is referred to as the "minimization requirement." Although "[t]he statute does not forbid the interception of all nonrelevant conversations," the government must make reasonable efforts to "minimize" the interception of such conversations." *Scott v. United States*, 436 U.S. 128, 139–40 (1978). In reviewing the performance of law enforcement in conducting "minimization," the court must assess the objective conduct of the monitors conducting surveillance, rather than their subjective intent or lack of motive to actually minimize interception. *Id.* at 138–39. Before the court can find that the government failed to comply with the minimization requirement, the defendant must show that "some conversation was intercepted which clearly would not have been intercepted had reasonable attempts at minimization been made." *Scott*, 516 F.2d 751, 757

(D.C. Cir. 1975), *aff'd*, 436 U.S. 128 (1978). In short, "[w]hat the wiretapping statute forbids is failure by the government to make reasonable efforts to minimize interceptions of non-pertinent communications; consequently, a defendant must identify particular conversations so that the government can explain their non-minimization." *United States v. Carter*, 449 F.3d 1287, 1295 (D.C. Cir. 2006).

In analyzing a minimization challenge, the court must determine whether the government made reasonable attempts at minimization. Such a determination of reasonableness depends on the facts and circumstances of each case—"[b]ecause of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide ever case." *Scott*, 436 U.S. at 139. In determining whether the government properly minimized, it is important to consider circumstantial factors, such as the number of short calls intercepted, whether the surveillance target is part of a widespread conspiracy, what type of telephone line is being monitored, at what point in the investigation the interception took place, the involvement of one or more co-conspirators in the intercepted calls, and whether the conversation being intercepted is ambiguous. *Id.* at 140–42.

## III.   ANALYSIS

### A.   Scurry's Motion to Suppress Wiretap Evidence

Scurry argues that the affidavits in support of the applications to intercept his wire communications did not establish the requisite probable cause and did not meet the necessity requirement imposed by 18 U.S.C. § 2518. Scurry also argues that the government failed to properly minimize the telephone calls intercepted on his line.

## 1. *Probable Cause*

Scurry seems to argue that a failure to satisfy the necessity requirement of 18 U.S.C. §§ 2518(1)(c) and (3)(c) also constitutes a failure to establish probable cause for the wiretap of his telephone and extension thereof. This argument is unsubstantiated and nonsensical. Moreover, a review of the affidavit submitted by Special Agent ("SA") Fiorito demonstrates that probable cause was established. SA Fiorito's affidavit asserted that agents learned from one reliable cooperating witness that Scurry had been selling crack cocaine in the Second Court of the 4200 block of Fourth Street, S.E., Washington, D.C., since at least 2005. *See* Fiorito Aff., Apr. 22, 2010, at ¶¶ 17–20, TIII1431–1432. Agents learned from a second reliable cooperating witness ("CW2") that Scurry had offered to sell CW2 crack cocaine. *See* Fiorito Aff., Apr. 22, 2010, at ¶ 34, TIII1437. Starting in November 2009, investigating agents made nine separate controlled purchases of crack cocaine from Scurry using CW2. In the first controlled purchase, Scurry provided his cellular telephone number to CW2. Although Scurry transposed two of the digits, he corrected his error during the third controlled purchase. In all of the remaining controlled buys, Scurry used his telephone to set up each buy. In or about January 2010, Scurry acquired a second cellular telephone and began using it. In or about March 2010, Scurry stopped using his first telephone. In the last controlled buy on March 12, 2010, Scurry called CW2 using the second cellular telephone. *See* Fiorito Aff., Apr. 22, 2010, at ¶¶ 35–58, TIII1437–1450. An analysis of pen register data of the two telephones showed that they were in contact with 75 common telephone numbers. *See* Fiorito Aff., Apr. 22, 2010, at ¶¶ 59–62, TIII1450–1455. These details in SA Fiorito's affidavit established that there was probable cause to believe that Scurry was using his cellular telephone to conduct drug deals and that immediately prior to the interception request, he acquired a new cellular telephone. The government therefore properly

8

established probable cause to conduct a wiretap of Scurry's cellular telephone, as required by 18 U.S.C. § 2518(1)(b)(i).

### 2. *Necessity*

Scurry also argues that the government's application to wiretap Scurry's cellular telephone did not meet the necessity requirement imposed by 18 U.S.C. §§ 2518(1)(c) and (3)(c). However, SA Fiorito's affidavits are sufficient to meet this statutory requirement.  In SA Fiorito's affidavit for the initial wiretap application, SA Fiorito explained in detail why physical surveillance, use of undercover personnel, use of cooperating witnesses and/or confidential informants, use of the grand jury, interviews of subjects and associates, use of search warrants, analysis of pen registers and air time records, and trash pulls had been tried and failed, why they reasonably appeared unlikely to succeed if tried, or why they would be too dangerous.  *See* Fiorito Aff., Apr. 22, 2010, at ¶¶ 64–85, TIII1455–1467.  In his affidavit in support of the government's application for an extension of the wiretap, SA Fiorito discussed the evidence developed during the first 30 days of interceptions, physical surveillance, cell site tracking and geolocation data, use of undercover police personnel, use of cooperating witnesses and confidential informants, use of the grand jury, interviews of subjects or associates, search warrants, and analysis of pen registers and air time records that had been tried and failed, why they reasonably appeared unlikely to succeed if tried, or why they would be too dangerous.  *See* Fiorito Extension Aff. at ¶¶ 45–69, TIII1503–1516.

Scurry argues that the affidavits in support of the applications to intercept his wire communications did not meet the necessity requirement for two reasons.  First, he argues that the affidavit states that a search warrant would not be effective because it is not known where and when drugs were being stored at Scurry's residence, but on December 7, 2009, Scurry returned

to his residence during a controlled buy to obtain drugs. Second, Scurry argues that the agents had the option of utilizing GPS devices on Scurry's vehicles. The content of the affidavits, however, shows otherwise.

With respect to the use of search warrants, SA Fiorito explained that although investigators had followed Scurry to his residence during a controlled buy so that Scurry could obtain additional crack cocaine—thereby allowing them to infer that Scurry used his residence as a stash house—executing a search warrant at Scurry's home at that time would be premature. This was because executing a search warrant would not capture "the full scope of the conspiracy" and "would not identify the source of supply and the other principals involved in this criminal conspiracy." Fiorito Aff., Apr. 22, 2010, at ¶ 81, TIII1464. Moreover, SA Fiorito represented that he knew that drug dealers maintained multiple stash houses and that Scurry specifically utilized various unidentified apartments in the 4200 block of Fourth Street, S.E., Washington, D.C., to sell from and to run into if law enforcement officers entered the area. *Id.* at ¶ 82, TIII1464–1465. SA Fiorito concluded:

> Search warrants would alert the target subjects to the existence of the investigation and would prevent the identification of other co-conspirators and/or the seizure of substantial contraband. Moreover, investigative methods used to date do not by themselves seem likely to yield additional information about the storage and packaging locations. Without interception of wire communications, it would be difficult to know when and where narcotics transactions are to occur, which would be essential to the successful execution of any search warrant that would result in a substantial seizure of contraband.

*Id.*

Regarding Scurry's argument that the government could have utilized a GPS device on Scurry's vehicles, SA Fiorito explained in his affidavit for an extension of the authorization to intercept Scurry's wire communications that the use of geolocation information, while helpful to

the investigation, had its limitations. He noted that the geolocation information that had been collected from Scurry's telephone, as authorized by the first interception order, was

> extremely useful insofar as it has assisted agents in discerning patterns of [Scurry's] whereabouts between surveillance efforts, at times when [Scurry] was participating in pertinent intercepted conversations. For example, it was the collection of geolocation information on April 10, 2010, that allowed the FBI to determine that [Scurry] was in fact on 4th Street SE when he was speaking to [Hudson].

Fiorito Extension Aff. at ¶ 59, TIII1509–TIII1510. Although this geolocation information was obtained from Scurry's cellular telephone as opposed to Scurry's vehicle, SA Fiorito's explanation demonstrates how the further use of geolocation information would be limited in its potential to advance the investigation's objectives.[1]

Because the affidavits in support of the government's wiretap applications for Scurry's cellular telephone have shown "that other techniques are impracticable under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation," *Johnson*, 696 F.2d at 123, they have properly met the necessity requirement.

### 3. *Minimization*

Scurry also contends that in conducting the wiretaps of his cellular telephone line, the government failed to fulfill its obligation under 18 U.S.C. § 2815(5) to minimize the interception of communications not otherwise subject to interception. According to Scurry, "out of 9012 completed calls, 1177 were pertinent. Of the remaining 6523 calls, it is assumed all were non-pertinent. Of the non-pertinent calls, 504 lasted between one and two minutes and 360 lasted longer than two minutes." Scurry Mot. [59] to Suppress, at 7. Based on these statistics, Scurry reasons, the government failed to minimize the interception of non-pertinent calls.

---

[1] At the time that the government applied for and obtained the authorization to intercept Scurry's wire communications, the D.C. Circuit had not yet ruled on the issue of whether a warrant is necessary to utilize a GPS device on a vehicle. However, Scurry concedes that the agents attempted to obtain a warrant to utilize GPS devices on Scurry's vehicles, but ultimately failed to do so.

Before the Court can find that the government failed to comply with the minimization requirement, the defendant must show that "some conversation was intercepted which clearly would not have been intercepted had reasonable attempts at minimization been made." *Scott*, 516 F.2d 751, 757 (D.C. Cir. 1975), *aff'd*, 436 U.S. 128 (1978). "A defendant who does not identify specific conversations that should not have been intercepted, or even a pattern of such conversations has offered no concrete indications that the government failed to meet its obligations to minimize intercepted communications . . . ." *Carter*, 449 F.3d at 1295 (internal quotations and citations omitted). Here, Scurry's motion to suppress the cell phone wiretap evidence does not identify any conversation or pattern of conversations by which the Court can determine whether the government met its minimization obligations. Rather, Scurry seems to point to the number of non-pertinent calls that were not minimized by the government—a number that the government claims to be the result of flawed calculations by Scurry. However, "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer." *Scott*, 436 U.S. at 140. While such percentages may provide assistance, there may be cases "where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable." *Id.* And regardless of the disparity between the defendant's and the government's calculations, Scurry cannot "[rely] solely on the existence of a raw percentage of non-pertinent intercepted calls as a means of demonstrating that some conversations were intercepted when they would not have been had reasonable attempts at minimization been made." *Carter*, 449 F.3d at 1295 (citing *Scott*, 236 U.S. at 140). The Court therefore denies Scurry's motion to suppress wiretap evidence based on the government's failure to meet the minimization requirement of 18 U.S.C. § 2815(5).

**B. Hudson's Motion to Suppress Wiretap Evidence**

Hudson argues that the affidavit in support of the government's application to intercept his wire communications was not supported by probable cause and did not meet the statutory necessity requirement. Hudson also contends that the evidence gathered from the wiretap of his telephone should be suppressed because the order authorizing the interception of his telephone failed to specifically name the person that authorized the application.

### 1. *Probable Cause*

Like Scurry, Hudson argues that the affidavit in support of the government's application to intercept his calls fails to establish probable cause. However, the affidavit submitted by SA Fiorito in support of the government's application clearly establishes probable cause. The affidavit asserts that agents learned during the interception of Scurry's telephone calls that Hudson used his telephones to engage in at least five categories of drug-related calls: (1) narcotics-related conversations between Hudson and Scurry; (2) conversations regarding suspected narcotics meetings between Hudson and Scurry; (3) conversations related to the delivery of money to Hudson by Scurry; (4) conversations related to Hudson re-supplying Scurry with crack cocaine; and (5) conversations between Hudson and Scurry involving a potential common supplier. *See* Fiorito Aff., Jun. 11, 2010, at ¶¶ 26–75, TIII1549–1569. These assertions properly constitute probable cause to believe that Hudson was using his cellular telephone to commit violations of the federal narcotics laws. The affidavit therefore meets the probable cause requirement of 18 U.S.C. § 2518(1)(b)(i).

### 2. *Necessity*

Hudson also maintains that the affidavit in support of the government's wiretap application did not meet the necessity requirement of 18 U.S.C. §§ 2518(1)(c) and (3)(c).

Specifically, Hudson argues that government could have successfully relied on other methods to obtain additional evidence—the interception of Scurry's telephone calls, physical surveillance, the use of undercover police personnel, and the use of pen registers—rather than applying for a wiretap. However, the affidavit clearly shows how these "other techniques are impracticable under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation." *Johnson*, 696 F.2d at 123 (internal citations and quotations omitted).

Hudson first argues that continuing to intercept Scurry's calls would have moved the investigation forward as it related to Hudson. However, continuing to intercept Scurry's communications would not have helped the agents satisfy the goals of the investigation. Specifically, Scurry's calls provided the government with "little or no information concerning Hudson's source of supply and his additional customers besides Scurry" or "Hudson's relationship with . . . other co-conspirators." Fiorito Aff., Jun. 11, 2010, at ¶¶ 78–79, TIII1571–1572.

Next, Hudson argues that the government should have continued to gather information by conducting physical surveillance. However, SA Fiorito explained in his affidavit that Hudson, Scurry, and their co-conspirators were "highly surveillance-conscious" and that overuse of physical surveillance increases the risk that the investigation will be exposed to the targets. Fiorito Aff., Jun. 11, 2010, at ¶ 82, TIII1573. The affidavit went on to note that on one occasion in this investigation, Hudson and Scurry specifically discussed a particular vehicle that they had both observed conducting surveillance. *Id.* at ¶ 83. In addition, when agents tried to conduct surveillance on a meeting between Scurry and some of his coconspirators while parked in a van in a parking lot in front of a building used by the coconspirators, the coconspirators discovered the van, walked up to it and started peering into the windows, and began pounding on the

vehicle—causing the agents inside the van to become concerned for their safety and drive away. *Id.* In response to this incident, the coconspirators ceased using the building next to where the van had been parked. *Id.* at ¶ 84, TIII1574. The affidavit thus illustrates how the use of physical surveillance alone would not have satisfied the objectives of the investigation.

Hudson further argues that the government made no attempt to use undercover officers or confidential informants to gather evidence about Hudson. In so arguing, Hudson misunderstands the requirements of 18 U.S.C. § 2518(1)(c). The statute does not require the government to use every possible investigative technique before applying for a wiretap, but rather mandates that the government make "a full and complete statement as to whether or not other investigative procedures have been tried and failed *or* why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c) (emphasis added). Based on the statutory language, an explanation of why a particular investigatory procedure would reasonably appear to be unlikely to succeed if tried is sufficient to meet the necessity requirement. As SA Fiorito explained in the affidavit, CW2's position in the narcotics world of the Second Court was that CW2 could purchase crack cocaine directly from Scurry or from others at Scurry's direction. Fiorito Aff., Jun. 11, 2010, at ¶ 89, TIII1577–1578. CW2 did not, however, have a relationship with Hudson that would put him in a position to purchase narcotics from Hudson. *Id.* With respect to the use of undercover officers, SA Fiorito explained that there were no undercover officers that could infiltrate this conspiracy at Hudson's level and that in any event, the agents did not have a cooperating witness that Hudson trusted enough to introduce a potential undercover officer to Hudson. *Id.* at ¶ 88, TIII1577. These explanations were sufficient to meet the necessity requirement of 18 U.S.C. § 2518(1)(c) and allow Judge Kennedy to find that these

investigative techniques would not have succeeded if they had been attempted, meeting 18 U.S.C. § 2518(3)(c).

Hudson also argues that the government did not exhaust the leads from the pen registers before applying for a wiretap, but as the Court has just clarified, § 2518(1)(c) does not require the government to use every possible investigative technique before seeking authorization for a wiretap. Rather, SA Fiorito met the necessity requirement by explaining why the use of pen registers reasonably appeared unlikely to succeed if tried. The affidavit detailed how pen registers and air time records

> provide only limited evidence of narcotics dealing between individuals. Such records in and of themselves are useful mainly in establishing relationships and patterns of operations, and provide little direct evidence of the significance of the telephone calls. Without access to the content of the conversations or text messages, law enforcement agents cannot know for certain whether calls or electronic communications to or from the target telephones involve drug customers or other conspirators.

Fiorito Aff., Jun. 11, 2010, at ¶ 96, TI1581–1582. This explanation was sufficient to meet the necessity requirement. The statute does not require the agents to exhaust the leads from the pen registers before seeking a wiretap, as Hudson contends.

Finally, Hudson argues that the government's statements as to necessity were generalized and conclusory. However, SA Fiorito's affidavit specifically discusses nine separate investigatory techniques undertaken by the government, and explains the limited success they provided or why they are unlikely to satisfy the goals of the investigation without the interception of Hudson's wire communications. And although certain sentences in the affidavit, standing alone, may be conclusory, "[s]ections of an affidavit framed in conclusory terminology cannot rationally be separated from preceding detailed descriptions of investigative events." *Sobamowo*, 892 F.2d at 93 (internal quotations omitted).

The court therefore denies Hudson's request that the wiretap evidence be suppressed on the above bases.

### 3. *Identification of Authorizing Official*

Hudson also challenges the order signed by Judge Kennedy authorizing the interception of Hudson's wire communications because the name of the person at the Attorney General's Office who authorized the application is not included in the order.[2] "Any aggrieved person . . . may move to suppress the contents of any wire or oral communication intercepted . . ., or evidence derived therefrom, on the grounds that . . . the order of authorization or approval under which it was intercepted is insufficient on its face." 18 U.S.C. § 2518(10)(a)(ii). Under 18 U.S.C. § 2518(4)(d), an order authorizing the interception of wire communications is required to specify "the identity of the agency authorized to intercept the communications, and of the person authorizing the application." Rather than state the name of the authorizing individual at the Attorney General's Office, the order signed by Judge Kennedy authorizing the interception of Hudson's wire communications contains "******" in the place where the name of the authorizing individual should be located. *See* Order Authorizing Interception of Wire Communications, at TIII1329. That omission, however, does not mean that the application was not authorized. Attached to the application for the interception was a document signed by Bruce C. Swartz, Deputy Assistant Attorney General of the Department of Justice's Criminal Division, authorizing the interception of Hudson's wire communications.[3] *See* App. TIII1312, TIII1322–1323.

---

[2] Savoy specifically joins this aspect of Hudson's motion. *See* ECF No. 90.

[3] 18 U.S.C. § 2516(1) permits the following officers to authorize a wiretap application: "[t]he Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division . . . specially designated by the Attorney General . . . ."

While there is no law in the D.C. Circuit directly on point, numerous other courts have held that a wiretap order's failure to identify the person authorizing the application does not prejudice the defendant, so as to require suppression of the wiretap evidence, where the wiretap application was authorized by an appropriate individual within the Department of Justice and that authorizing individual was identified by name in the wiretap application. *See, e.g.*, *United States v. Small*, 423 F.3d 1164, 1178 (10th Cir. 2005); *United States v. Radcliff*, 331 F.3d 1153, 1160 (10th Cir. 2003); *United States v. Guzman-Torres*, 2011 WL 4639922, at *2 (W.D. Okla. Oct. 4, 2011); *United States v. Fudge*, 2001 WL 34377928, at *6–7 (W.D. Wis. Jun. 21, 2001). As in these cases, there is no dispute here that the application was authorized by an appropriate individual within the Department of Justice and that this authorizing individual was identified by name in the wiretap application. The failure to name the official in the wiretap order itself therefore did not result in prejudice to Hudson. As such, although the failure to include Swartz's name in the order rendered the order facially insufficient under 18 U.S.C. § 2518(10)(a)(ii), this failure constituted a technical defect that did not undermine the purposes of the statute or prejudice Hudson. *Radcliff*, 331 F.3d at 1160. The Court therefore denies Hudson's motion to suppress on this ground.

### C. Savoy and Brown's Motions to Suppress Wiretap Evidence

Savoy moves to suppress the evidence collected from the government's interception of his wire communications.[4] Brown also challenges the validity of the application for and order

---

[4] Savoy challenges both the government's June 11, 2010 application to intercept Hudson's cellular telephones and the government's June 22, 2010 application to intercept Savoy's cellular telephones. The Court has already addressed—and rejected—Savoy's arguments in the context of Hudson's challenge to the June 11 wiretap application. This section of the Memorandum Opinion therefore only addresses Savoy and Brown's objections to the government's July 22 wiretap application to intercept Savoy's communications, which are contained in docket numbers 90, 123-1, 156-1, 158, 178, 183, and 184.

authorizing the interception of the government's interception of the wire communications on Savoy's cellular telephones.

### 1. *Probable Cause*

Savoy argues that the affidavit in support of the government's July 22, 2010 application to intercept his cellular telephones fails to establish probable cause. According to Savoy, the government's wiretap application did not provide sufficient facts and information to allow Judge Kennedy to make an independent determination that probable cause exists to support the requested wiretaps. However, SA Ray's affidavit in support of the government's July 22, 2010 wiretap application establishes ample probable cause in support of the wiretap application.[5]

SA Ray's affidavit explained that "[a]n analysis of the pen registers and toll records for the two target telephones, as well as an analysis of the intercepted telephone calls involving or about [Savoy] on [Hudson/s] telephone, support the conclusion that there is more than the necessary probable cause to intercept the calls on [Savoy's] telephones." Ray Aff., July 22, 2010, at ¶ 24, TIII1604. The affidavit summarizes in detail a series of calls intercepted between Savoy and Hudson from June 14, 2010 to July 2, 2010 in which Savoy and Hudson discuss Savoy's resupply of narcotics (which SA Ray believes to be cocaine) to Hudson. *See* Ray Aff., July 22, 2010, at ¶¶ 29–69, TIII1609–1622. Immediately following a number of the calls on June 21, 2010, Savoy met with Hudson and "provided Hudson with the drugs they had been discussing in the prior telephone calls" that day. *Id.* at ¶ 58, TIII1616. SA Ray's summaries of the calls between Savoy and Hudson were based upon SA Ray's experience and training as well

---

[5] Savoy also challenges the government's June 11, 2010 application to intercept Hudson's cellular telephones on the basis that it did not establish probable cause. The Court has already addressed—and rejected—these arguments in the context of Hudson's challenge to these wiretap applications. This section of the Memorandum Opinion therefore only focuses on Savoy's challenge to the government's July 22, 2010 wiretap application.

as the training and experience of other agents and detectives in this and other investigations. *Id.* at ¶ 29, TIII1609.

The significant amount of narcotics trafficking activity detailed in the affidavit constitutes probable cause for the government to believe that Savoy was using both of the target telephones listed in the wiretap application to conduct drug transactions. The affidavit makes clear that the government did not, as Savoy contends, rely on "subjective, conclusory statements" of law enforcement agents in its application for a wiretap of Savoy's cellular phones. The Court therefore finds that sufficient probable cause existed to support Judge Kennedy's approval of the government's application for a wiretap of Savoy's cellular telephones.

### 2. *Necessity*

Savoy argues that the affidavits in support of the government's applications fail to meet the necessity requirement because they contain conclusory statements that the law enforcement agents believe that ordinary investigative measures were not expected to be effective. He also asserts that the affidavits failed to provide adequate detail regarding the extent to which ordinary investigative methods had been implemented, or the futility of doing so.

Although SA Ray's affidavit does contain conclusory statements regarding the efficacy of normal investigative procedures employed by the government, these conclusions are accompanied by lengthy descriptions of what other investigative techniques had been utilized and why their continued use would not be successful. These other investigative techniques included: reliance on previous interceptions of communications, Ray Aff., July 22, 2010, at ¶¶ 72–75, TIII1623–1624; physical surveillance, *id.* at ¶¶ 76–83, TIII1624–1629; cellsite tracking and geolocation data, *id.* at ¶ 84, TIII1628–1629; use of undercover police personnel, *id.* at ¶ 85, TIII1629–1630; use of cooperating witnesses and confidential informants, *id.* at ¶¶ 86–88,

TIII1630–1631; the grand jury, *id.* at ¶¶ 89–90, TIII1631–1632; interviews of subjects or associates, *id.* at ¶ 91, TIII1632–1633; search warrants, *id.* at ¶¶ 92–93, TIII1633–1634; and analysis of pen registers and airtime records, *id.* at ¶ 94, TIII1634–1635. "Sections of an affidavit framed in conclusory terminology cannot rationally be separated from . . . detailed descriptions of investigative events." *Sobamowo*, 892 F.2d at 93 (internal quotations omitted). The government therefore properly met the statutory necessity requirement.

### 3. *Authorization of the Government's Wiretap Application*

Savoy and Brown also challenge the government's July 22, 2010 wiretap application on the basis that the application was not approved by an official within the Department of Justice listed in 18 U.S.C. § 2518(11)(b)(i): "the Attorney General, the Deputy Attorney General, the Associate Attorney General, an Assistant Attorney General, or an acting Assistant Attorney General." 18 U.S.C. § 2518(11)(b)(i).[6] Additionally, Savoy and Brown contend that the application did not conform to 18 U.S.C. § 2518(1)(a), which mandates that the application shall inform the judge of the identity of the official authorizing the application. They also point out that the order signed by Judge Kennedy authorizing the interception of Savoy's cellular telephones similarly did not identify the official who had authorized the application, as required by 18 U.S.C. § 2518(4)(d).

The government agrees that the wiretap order does not satisfy the enhanced requirements for wiretap authorization pursuant to 18 U.S.C. § 2518(11). However, § 2518(11) applies to roving wiretaps, which the government neither sought nor implemented. "An ordinary wiretap specifies a particular location or telephone line for interception. Subject to the minimization requirement, any and all conversations occurring over that line may be legally intercepted, even if none of the targeted individuals named in the order is a party to the conversation." *United*

---

[6] Brown specifically joins this aspect of Savoy's motion. *See* ECF No. 104-1.

*States v. Silberman*, 732 F. Supp. 1057, 1062 (S.D. Cal. 1990). In contrast, "under a roving wiretap, interception of conversations to which a targeted individual is not a party is prohibited." *Id.* When the government seeks authorization for a roving wiretap, it "must establish that the target would thwart detection from a specified facility or location." *United States v. Hermanek*, 289 F.3d 1076, 1087 (9th Cir. 2002). "By enacting that provision, Congress contemplated the roving surveillance of suspects who move from room to room in a hotel or of alleged terrorists who use different telephone booths to avoid surveillance or who use cloned cellular phone numbers and change numbers frequently to avoid detection." *Id.* (internal citations and quotation marks omitted).

Section 2518(11) provides for the authorization of roving wiretaps in situations where the government is unable to specify with particularity "the facilities from which, or the place where, the communication is to be intercepted." A roving wiretap requires authorization from one of several senior Justice Department officials at the level of Assistant Attorney General or higher, *see* 18 U.S.C.§ 2518(11)(b), whereas a standard wiretap application may be authorized by a Deputy Assistant Attorney General designated to make such applications by the Attorney General, *see* 18 U.S.C. § 2516(1). The government's application to intercept Savoy's wire communications clearly identified the facilities to be tapped by their phone numbers and by their respective identification numbers, satisfying the requirements of 18 U.S.C. §§ 2518(1)(b)(ii) and 2518(4)(b). *See* App. ¶ 2, TIII1351–1352. As a result, the application was properly authorized by Deputy Assistant Attorney General John C. Keeney, in compliance with 18 U.S.C. § 2518(1)(a). *See* App. ¶ 4, TIII1353; TIII1365–1366. The order authorizing the government's interception of Savoy's wire communications similarly properly identified Deputy Assistant Attorney General Keeney as the authorizing official. *See* TIII1375. *See United States v.*

22

*Goodwin*, 141 F.3d 394, 402–03 (2d Cir. 1997) (recognizing that "authorization by a Deputy Assistant Attorney General was sufficient" where the "government's affidavits in support of its application clearly identified the facilities to be tapped by their telephone numbers and by their electronic serial numbers").  The Court therefore rejects this challenge to the wiretap of Savoy's cellular telephones raised by Savoy and Brown.

#### 4. *Nature and Location of the Facilities*

Savoy and Brown also challenge the government's applications and orders for wiretaps on the basis that they did not include "a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted," as required by 18 U.S.C. § 2518(1)(b)(ii).  Specifically, Savoy and Brown argue that the government did not— and could not—specify the *particular location* of the facilities from which the communications were to be intercepted.  Savoy and Brown maintain that because the government sought wiretaps of cellular telephones, the government was required to proceed under § 2518(11).  And because the government did not satisfy the requirements of § 2518(11), they argue, it did not secure roving wiretaps.   Despite that, Savoy and Brown say, the government conducted roving surveillance because it intercepted communications transmitted by unspecified communication transmission facilities—cell phone towers—at unspecified locations.

Savoy and Brown claim that they are not arguing that all wiretaps of cell phones constitute roving wiretaps, yet because of the impossibility of predicting where a cell phone will be used at any given time, any demand that the government specify the locations where a cell phone will be used effectively stands for that argument.  They attempt to distinguish their argument from that of the defendant in *Goodwin* by maintaining that they are not arguing that the government could not identify the *facilities* to be tapped—that is, the cell phone—but rather that

the government could not identify the *location* of the facilities to be tapped. This claim ignores the fact that the location of a cellular telephone is wherever that phone is being used, and thus is part of the facility itself. Where the defendant in *Goodwin* correctly noted that it is impossible to predict a cell phone's location, *Goodwin*, 141 F.3d at 403, Savoy and Brown seem to argue that the government enjoys some sort of clairvoyant power that would enable it to determine at any given time where a cell phone is going to be used, and that the government must include this information in its wiretap application.

Savoy and Brown rely on *U.S. Telecom Ass'n v. F.C.C.*, 227 F.3d 450 (D.C. Cir. 2000), for the proposition that "[in] the wireline environment, . . . law enforcement agencies have generally been able to obtain location information routinely from the telephone number because the telephone number usually corresponds with location. In the wireless environment, the equivalent location information is the location of the cell sites to which the mobile terminal or handset is connected at the beginning and at the termination of the call." *U.S. Telecom Ass'n v. F.C.C.*, 227 F.3d 450, 464 (D.C. Cir. 2000).

Initially, the Court notes that Savoy and Brown's reliance on *U.S. Telecom* is misguided. In *U.S. Telecom*, telecommunications industry associations and privacy rights organizations challenged certain portions of the FCC's implementing order, arguing that the FCC exceeded its statutory authority. *See U.S. Telecom*, 227 F.3d at 453. Not only do Savoy and Brown take the quoted phrase out of context, but they seek to rely on a civil case reviewing an agency action in order to interpret a criminal statute. Civil case law has no precedential or persuasive effect in this context, where the defendants seek to suppress evidence on the basis that the government did not comply with criminal statutory requirements.

Furthermore, as explained above, the government followed the procedures for obtaining a standard wiretap enumerated in 18 U.S.C. §§ 2518(1)–(4) and therefore was not required to include the roving wiretap elements in the applications for and orders authorizing interception. *See Goodwin*, 141 F.3d at 402–03. "In the wiretap context, [the Fourth Amendment] requirements are satisfied by identification of the telephone line to be tapped and the particular conversations to be seized." *United States v. Donovan*, 429 U.S. 413, 427 n.15 (1977). Identifying the communication facilities to be intercepted by their telephone number and electronic serial number (ESN) satisfies the requirements of 18 U.S.C. §§ 2518(1)(b)(ii) and 2518(4)(b). *Goodwin*, 141 F.3d at 403. In the wiretap application to intercept Savoy's wire communications, the government properly identified each of the target cellular telephones by its phone number, its ESN or IMSI, its subscriber, that subscriber's listed address, and the suspected user. *See* App. ¶ 2, TIII1351–1352. In addition, the application provided that each of the target cellular telephones were being used in the District of Columbia and elsewhere. *See id.* at ¶ 3, TIII1352.

For these reasons, the Court denies Savoy and Brown's motions to suppress wiretap evidence.

### D. Johnson's Motion to Suppress Wiretap Evidence

Johnson also moves to suppress the electronic surveillance evidence obtained as a result of multiple wiretaps.

#### 1. Jurisdiction

First, Johnson argues that Judge Kennedy lacked jurisdiction to issue the wiretap authorization order. An application for an order authorizing the interception of wire communications must be filed with "a judge of competent jurisdiction," 18 U.S.C. § 2518(1),

which includes "a judge of a United States district court or a United States court of appeals," *id.* § 2510(9). 18 U.S.C. § 2518(3) authorizes a district court judge to approve a wiretap "within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction)." Other courts have declined to interpret the term "mobile interception device" to include a cellular telephone." *See, e.g., United States v. North*, 2011 WL 653864, at *4 n. 7 (S.D. Miss. Feb. 14, 2011). *But see United States v. Ramirez*, 112 F.3d 849, 853 (7th Cir. 1997). However, the Fifth Circuit held in *United States v. Denman* that "[b]ecause the definition of interception encompasses the aural acquisition of the contents of the communication," the location of the interception includes "the situs of the telephone itself" and "the place where the contents of a wire communication are first to be heard and understood by human ears, other than those of the parties to the conversation," that is, the original listening post. 100 F.3d 399, 403 (5th Cir. 1996) (citing *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992)). Although *Denman* involved a land-line phone, courts have applied the same definition of interception to hold that cell phone communications "are deemed intercepted at two places: where the tapped telephone is located and where the communications are overheard." *United States v. Goodwin*, 131 F.3d 132 (2d Cir. 1997) (unpub.) (citing *Rodriguez*, 968 F.2d at 136, and *Denman*, 100 F.3d at 402–04).

Johnson maintains that Judge Kennedy did not have jurisdiction to issue an order approving the government's wiretap application on phone number 240-246-4443 unless the listening post was located in the District of Columbia, or unless Johnson was in the District when he made the intercepted calls. Johnson says that he does not know where the FBI's listening post was located for the wiretap on 240-246-4443, and Johnson asserts—without support—that he has

reason to believe that none of the intercepted calls were made from inside the District of Columbia. However, SA Ray's affidavit in support of the government's wiretap application plainly states that the wire interceptions on this telephone will be monitored at the FBI's Washington Field Office, which is located within Judge Kennedy's jurisdiction, and gives details to support SA Ray's assertion that Johnson is using the telephone to discuss and facilitate drug trafficking in Washington, D.C. *See* Ray Aff., Sept. 10, 2010, at ¶ 7, TIII1644. "[A] district judge in the district where the listening post is located would undeniably have territorial jurisdiction to issue a wiretap authorization." *North*, 2011 WL 653864, at *6. Therefore, the Court finds that Judge Kennedy had proper jurisdiction to issue a wiretap order authorizing interception of Johnson's cellular telephone.[7]

### 2. *Nature and Location of the Facilities*

Johnson also challenges the order authorizing the interception of Johnson's wire communications on the basis that the order did not identify "the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted." 18 U.S.C. § 2518(4)(b). The Court reiterates that identifying the communication facilities to be intercepted by their telephone number and electronic serial number satisfies the requirements of 18 U.S.C. § 2518(4)(b). *Goodwin*, 141 F.3d at 403. The order signed by Judge Kennedy properly identifies the cellular telephone to be intercepted its phone number and international mobile serial identification number. *See* Order to Service Provider at 2, TIII1398. The Court

---

[7] While "[t]he requirement of judicial approval is obviously at the core of the congressional purposes underlying [the] statute," *United States v. Moore*, 41 F.3d 370, 375 (8th Cir. 1994), territorial jurisdiction is not central to the purposes of Title III. *See, e.g., Adams v. Lamkford*, 788 F.2d 1493, 1497 (11th Cir. 1986); *United States v. Rodriguez*, 734 F. Supp. 116, 120 (S.D.N.Y. 1990). If "a judge of competent jurisdiction reviewed the applications and issued the challenged intercept orders, . . . the essential requirement of § 2518 that law enforcement authorities convince a District Court that probable cause existed to believe that a specific person was committing a specific offense using a specific telephone was met. Therefore, suppression is not required on jurisdictional grounds, regardless of whether the listening post or tapped cell phone was located within the court's territorial jurisdiction." *North*, 2011 WL 653864, at *6 (internal quotations and citations omitted).

therefore finds that the order authorizing the interception of Johnson's cellular telephone met the requirements of 18 U.S.C. § 2518(4)(b).[8]

### 3. *Authorization of the Governments' Wiretap Application*

Johnson further challenges the order signed by Judge Kennedy authorizing the interception of Johnson's wire communications because the order omits the name of the person at the Attorney General's Office who authorized the application. Under 18 U.S.C. § 2518(4)(d), an order authorizing the interception of wire communications is required to specify "the identity of the agency authorized to intercept the communications, and of the person authorizing the application." Rather than state the name of the authorizing individual at the Attorney General's Office, the order signed by Judge Kennedy authorizing the interception of Johnson's wire communications contains "*" in the place where the name of the authorizing individual should be located. *See* Order Authorizing Interception of Wire Communications, at TIII1404. That omission, however, does not mean that the application was not authorized. Attached to the application for the interception was a document signed by Kenneth A. Blanco, Deputy Assistant Attorney General of the Department of Justice's Criminal Division, authorizing the interception of Hudson's wire communications.[9] *See* App. TIII1396.

As explained above, numerous other courts have held that a wiretap order's failure to identify the person authorizing the application does not prejudice the defendant, so as to require suppression of the wiretap evidence, where the wiretap application was authorized by an

---

[8] Johnson also argues that Judge Kennedy's order is insufficient on its face because it does not include a statement of jurisdiction or assert the location of the FBI listening post or the location of Johnson and his cell phone. The Court notes that the order's identification of Johnson's cell phone by its phone number and serial number is sufficient to fulfill the requirements of § 2518(4)(b) because the statute requires specification of either the nature and location of the communications facilities as to which authority to intercept is granted *or* the place where authority to intercept is granted—not both. *See* 18 U.S.C. § 2518(4)(b).

[9] 18 U.S.C. § 2516(1) permits the following officers to authorize a wiretap application: "[t]he Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division . . . specially designated by the Attorney General . . . ."

appropriate individual within the Department of Justice and that authorizing individual was identified by name in the wiretap application. *See, e.g.*, *United States v. Small*, 423 F.3d 1164, 1178 (10th Cir. 2005); *United States v. Radcliff*, 331 F.3d 1153, 1160 (10th Cir. 2003); *United States v. Guzman-Torres*, 2011 WL 4639922, at *2 (W.D. Okla. Oct. 4, 2011); *United States v. Fudge*, 2001 WL 34377928, at *6–7 (W.D. Wis. Jun. 21, 2001). As in these cases, there is no dispute here that the application was authorized by an appropriate individual within the Department of Justice and that this authorizing individual was identified by name in an authorization memorandum that was attached to the wiretap application. The failure to name the official in the wiretap order itself therefore did not result in prejudice to Johnson. As such, although the failure to include Deputy Assistant Attorney General Blanco's name in the order rendered the order facially insufficient under 18 U.S.C. § 2518(10)(a)(ii), this failure constituted a technical defect that did not undermine the purposes of the statute or prejudice Johnson. *Radcliff*, 331 F.3d at 1160. The Court thus denies Johnson's motion to suppress on this ground.

## E.  CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that defendants' Motions [59, 77, 90, 105, 108] to suppress evidence obtained from interceptions of wire communications are DENIED; and it is further

ORDERED that the government shall file, within 10 days of the date of this Order, a proposed redacted version of the August 3, 2012 sealed Memorandum and Order that could be released to the public. If the government fails to submit a timely response, it will be deemed to have consented to a full unsealing of the Memorandum and Order.

SO ORDERED.

August 3, 2012

Royce C. Lamberth, Chief Judge

29