# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

)
)
**UNITED STATES OF AMERICA**          )
)
**v.**                    )          **Criminal Case No. 10-310 (RCL)**
)
**ROBERT DION SAVOY,** *et al.*,      )
**Defendants.**              )
)
)
_____)

## MEMORANDUM OPINION

Pending before the Court are numerous pre-trial motions filed by six defendants and the government.[1]   All six defendants have filed motions to suppress evidence seized through physical searches of their homes or homes to which they had a connection; defendant Scurry moves to suppress evidence seized during a search of his vehicles.   Defendant Hudson also moves to suppress statements he made during the search of his home.   Scurry, Savoy, and Brown have filed additional miscellaneous motions which are dealt with in turn below.   Finally, the government has filed one motion to allow impeachment of defendants Hudson and Robinson with their prior felony convictions.

Upon consideration of the defendants' and government's motions, responses of the parties, and relevant law, the Court hereby DENIES defendants' motions to suppress physical evidence [35, 37, 38, 58, 63, 67, 89, 101, 201]; DENIES Savoy's Motion for a Pretrial Hearing [36], DENIES Scurry's Motion to Compel Disclosure of Information Regarding Confidential Informants, Witnesses, and Cooperating Criminals [53]; DENIES Scurry's Motion for a Bill of

---

[1] The Court has granted motions from all defendants except Robinson and Hudson to adopt and join in all motions filed by other co-defendants not inconsistent with one another's positions.  Robinson has not adopted or joined any other motion.  Hudson adopts or joins only pending motions [53] and [89].

Particulars [54]; DENIES Scurry's Request for Notice Prior to Trial of Government's Intention to Present Evidence Pursuant to 404(b) [55]; DENIES Scurry's Motion for Discovery of Detector Dog Information [70]; DENIES Brown's Request for Preservation of Electronic Mail [60]; and GRANTS Hudson's Motion to Suppress Statements [76].  The Court does not rule today on the Government's Motion to Impeach Defendants with Prior Convictions Pursuant to Rule 609 [68].

I.      **Background**

In 2009, prompted by renewed violence in the 4200 block of Fourth Street, S.E., Washington, D.C., the Federal Bureau of Investigation's (FBI) Safe Streets Task Force began investigating the cocaine and crack dealers in that area.  Agents and detectives introduced a confidential informant into the area, who made a series of controlled purchases of crack cocaine from Eric Scurry from November 2009 to March 2010.  In addition to reliance on physical and audio- and video-surveillance, the task force also secured warrants to intercept cellular telephone wire communications of defendants Scurry, Hudson, Savoy, and Johnson.

The government's theory, as outlined in the affidavits, suggests that Jerome Johnson sold wholesale amounts of powder cocaine to Robert Savoy.  Gov't Omnibus Resp. Defs.' Mots., Ex. 8, at 9, ECF No. 111-8.  Savoy also collaborated with James Brown to buy wholesale quantities of cocaine.  *Id.*  Savoy then re-sold powder cocaine and crack cocaine to others, including Terrence Hudson and an unindicted suspect.  *Id.*  Hudson, Brown, and a second unindicted suspect resold powder and crack cocaine to others.  Specifically, Hudson would resell to Eric Scurry and two additional unindicted suspects.  *Id.*  Finally, Nathan Robinson allegedly sold

narcotics in the same geographic area as Scurry and a fifth unindicted suspect and the three would assist one another with sales in that area. *Id.*

Based on the evidence generated during this investigation, a grand jury issued multiple indictments against various alleged co-conspirators. The most recent, the Third Superseding Indictment issued in December 2011, charged Savoy, Hudson, Johnson, Eric Scurry, Robinson, and Brown, with Conspiracy to Distribute and Possess with Intent to Distribute 5 Kilograms or More of Cocaine and 280 Grams or More of Cocaine Base, in violation of Title 21, United States Code, Section 846. The indictment also included an additional thirty seven substantive counts against defendants.

Defendants filed motions to suppress evidence obtained from the government's interceptions of their wire communications. This Court denied those motions in August 2012. The Court now considers additional pre-trial motions filed by defendants and the government.

## II.   <u>Motions to Suppress Evidence Seized through Searches [35, 37, 38, 58, 63, 67, 89, 101, 201]</u>

### a.   <u>Background</u>

Each of the six defendants has filed a motion to suppress physical evidence recovered during a search of his residence and defendant Scurry has filed a motion to suppress evidence recovered from his vehicles. Between November 7 and November 9, 2010, Special Agent ("SA") Christopher M. Ray of the FBI submitted three applications for search warrants to the U.S. District Court for the District of Maryland and the U.S. District Court for the District of Columbia. Gov't Omnibus Resp. Defs.' Mots., Exs. 2, 4, 5, 7, 9–11, ECF No. 111-2, 111-4, 111-5, 111-7, 111-9–111-11. SA Ray requested search warrants for eight locations in Maryland

and three locations in the District of Columbia, including the residences of all six defendants, as well as warrants for three vehicles, belonging to Scurry.  *Id.*  The warrant applications were accompanied by lengthy affidavits from SA Ray.  Gov't Omnibus Resp., Exs. 3, 8, 12, ECF No. 111-3, 111-8, 111-12.

The affidavits included facts gleaned from the FBI's lengthy investigation into the distribution of powder and crack cocaine in and around the Washington, D.C. metro area.  Gov't Omnibus Resp., Ex. 8, at 8.  Specifically, they detailed information obtained from cooperating witnesses, controlled buys, physical surveillance, and finally, intercepted wire communications from the wiretaps authorized by Judge Henry H. Kennedy of the U.S. District Court for the District of Columbia.  *Id.*  According to SA Ray, each of the defendants had drug trafficking related communications or interactions with one or more co-defendants, controlled buyers, and/or unindicted suspects.  *Id.* at 9–10.  The affidavits also outlined the government's theory regarding the defendants'' alleged criminal activities.  Finally, each of the co-defendants and unindicted suspects whose residences the government sought to search had at least one, and typically multiple, prior narcotics charges or convictions.  *Id.* at 10–21.

### b.  Legal Standard

#### i.  Fourth Amendment Protections Generally

The Fourth Amendment protects against unreasonable searches and seizures by government actors.  U.S. Const. amend. IV.  Warrantless searches are generally *per se* unreasonable subject to limited exceptions.  *Katz v. United States*, 389 U.S. 347, 357, (1967) ("[T]his Court has emphasized that . . . searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.") (citations omitted).  Thus, a warrant is

usually required before a search may be conducted and the warrant must be supported by probable cause.  U.S. Const. amend. IV; *Katz*, 389 U.S. at 357–58.

For a warrant to issue, the magistrate must make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 237 (1983).  Thus, a probable cause determination encompasses both the probability that criminal activity is afoot, as well as a nexus between that activity and the place to be searched.  Additionally, probable cause may not be based on mere allegations or conclusory statements.  *See id.* at 239 (citing cases in which "wholly conclusory" or "bare bones" affidavits failed to provide a sufficient basis for probable cause).

Suppression of evidence derived from an unlawful search is the baseline remedy for Fourth Amendment violations.  However, as will be described in more detail below, this exclusionary rule has, for almost thirty years, been subject to a significant exception in cases where officers conducted the search pursuant to a warrant.

### ii.  <u>Standing to Challenge an Allegedly Unlawful Search or Seizure</u>

A defendant must have standing to challenge an allegedly unlawful search or seizure and to seek suppression of evidence derived therefrom.  Fourth Amendment rights are "personal" rights and may not be asserted by third parties.  *Rakas v. Illinois*, 439 U.S. 128, 132–34 (1978).  Thus, to challenge the validity of a search or the introduction of evidence seized therefrom, an individual must have a "legitimate expectation of privacy" in the place searched.  *Id.* at 143.

One moving to suppress evidence on the basis of an illegal search bears the burden of demonstrating that his own Fourth Amendment rights were violated by the search.  *Id.* 131 n.1

(citations omitted).  In *Rakas*, for example, the court held that petitioners lacked standing in part because they made "no showing that they had any legitimate expectation of privacy" in the areas searched.  *Id.* at 148.

An individual's expectation of privacy is perhaps at its height in his own home. However, individuals often have standing to challenge searches of places other than their own homes, including vehicles or the residence of another.  *Id.* at 142 (citing *Jones v. United States*, 362 U.S. 257, 265 (1960)).  This is part due to the Supreme Court's finding that Fourth Amendment rights do not depend upon "a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."  *Id.* at 143.

Some early cases suggested that an individual might have standing to challenge the search of a location if he was "legitimately on premises."  *See Jones*, 362 U.S. at 267 (holding that a guest staying temporarily in a friend's apartment had standing to challenge the search of that apartment).  However, subsequent cases have made clear that mere legitimate presence at a location does not automatically confer standing to challenge a search of that location.  *See Rakas*, 439 U.S. at 142–43 (noting that *Jones* "merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home" and rejecting the notion that merely being "legitimately on premises" confers standing to challenge a search of that location).  *Rakas* outlined a number of factors which, in *Jones*, had given rise to standing, including the fact that the movant had permission to stay in the apartment, had been given a key to the apartment, kept belongings there, and had "complete dominion and control over the apartment and could exclude others from it."  *Rakas*, 439 U.S. at 142–43, 149.

Subsequent to *Jones* and *Rakas*, however, the Supreme Court made clear that a guest in another's home need not have the level of "dominion and control" over the residence that gave rise to standing in *Jones*.  The Court, in *Minnesota v. Olson*, held that an overnight guest had standing to challenge the warrantless search of his host's home.  495 U.S. 91, 98–99 (1990).  In finding that the individual had a "legitimate expectation of privacy" in his host's home, the Court emphasized societal expectations of privacy in such circumstances and noted that "[w]e are at our most vulnerable when we are asleep [for example, in another's home] because we cannot monitor our own safety or the security of our belongings."  *Id.* at 99.

With respect to vehicle searches, Supreme Court precedent suggests that a defendant may have standing to challenge the search of a vehicle in which has a property or possessory interest. *See Rakas*, 439 U.S. at 148 (rejecting petitioners' claims in part because they "asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized"). Moreover, the fact that a vehicle is registered in another's name need not negate standing for one who has some privacy interest in the vehicle.  *See, e.g.*, *United States v. Williams-Davis*,  1992 WL 26025, at \*1–2 (D.D.C. 1991) (holding that defendant had standing to challenge search of car that he used and drove even though the car was registered in his aunt's name and the ownership of the car was disputed).

### iii.  **Probable Cause**

In making a probable cause determination for purposes of issuing a warrant, a magistrate should make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238 (1983).  The magistrate's decision is owed "'great deference by reviewing courts.'"  *Id.* at 236 (quoting *Spinelli v. United States*, 393

U.S. 410, 419 (1969); *accord United States v. Spencer*, 530 F.3d 1003, 1006–07 (D.C. Cir. 2008)). The magistrate's decision should not be subjected to de novo review. *Id.* The Supreme Court has directed that reviewing courts should not "invalidate . . . warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Id.* (citation omitted). "[S]o long as the magistrate had a "substantial basis for . . . conclud[ing]" that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.* at 236–37 (quoting *Jones*, 362 U.S. 257, 271 (1960)).

In examining whether probable cause existed to grant a search warrant, reviewing courts look at the "totality of the circumstances" rather than considering facts in isolation. *Id.* at 238. Relevant factors may include the affiant's experience and training, the reliability of any informants, prior similar criminal acts by individuals allegedly participating in the investigated criminal activity, etc. *See, e.g. United States v. Laws*, 808 F.2d 92 (D.C. Cir. 1986) (discussing the importance of the affiant's experience and noting that the criminal records of the suspects bore "weightily" on the issue of probable cause). While each fact within an affidavit may be insufficient when standing alone, the combination of all of the facts can establish probable cause. *See United States v. Catlett*, 97 F.3d 565, 574 (D.C. Cir. 1996); *United States v. Halliman*, 923 F.2d 873, 881 (D.C. Cir. 1991).

Of particular importance to this case is the magistrate's ability to look to the affiant's experience in putting potentially ambiguous or seemingly innocent conduct into context. S*ee United States v. Gilliam*, 167 F.3d 628, 633 (D.C. Cir. 1999). The D.C. Circuit has recognized the role that law enforcement experience can play in probable cause determinations. In *United States v. Laws*, for example, the court noted that an officer's more than ten years of experience in investigating narcotics distribution "enabled him to fit the informants' descriptions of the

suspects' behavior into a pattern familiar to drug-law enforcers" and to recognize facts as part of a modus operandi typical of drug trafficking.  808 F.2d 92, 103 (1986).  "Law-enforcement officers may draw upon their expertise in translating activity that appears innocuous to the untrained mind into grounds supporting a search or arrest warrant. . . .  In assessing probable cause, as the Supreme Court has declared, 'the evidence . . . collected must be seen and weighed not in terms of analysis by scholars, but as understood by those versed in the field of law enforcement.'"  *Id.* at 103–04.

Also relevant to this case is the ability of magistrates, in making a probable cause determination, to consider the past criminal involvement of the target of a warrant.  The D.C. Circuit has noted that the prior drug trafficking records of suspects may be one factor corroborating other information forming the basis of a probable cause decision, for example, the reliability informants' statements.  *Id.* at 104.

As already mentioned, probable cause requires not only a fair probability of criminal activity but also a nexus between that activity and the place to be searched.  In other words, it requires "a fair probability that contraband or evidence of a crime will be found *in a particular place*."  *Gates*, 462 U.S. at 237 (emphasis added).  The D.C. Circuit has held that "'observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for [the suspect's] residence."  *United States v. Thomas*, 989 F.2d 1252, 1254 (D.C. Cir. 1993) (per curiam).  The court in *Thomas* noted that the nexus simply requires a "reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence."  *Id.* at 1255.  In that case, probable cause to infer that evidence would be found in defendant's residence was supported by the affiant officer's statement that, "in his experience, drug dealers frequently keep business records, narcotics,

proceeds from sales, and firearms in their houses." *Id.* at 1254; *see also id.* at 1254–55 (citing cases from the Eighth and Ninth Circuits finding probable cause to search residences of those suspected of drug-related activities).

To establish probable cause, the facts relied upon in the government's application must also support an inference that evidence of a crime will be found in the place to be searched at the *time* of the search. This is often referred to as a requirement that information supporting the application not be "stale." The D.C. Circuit has noted that, while not controlling, the length of time between an event supporting the issuance of a warrant and the actual application of a warrant is an important factor. *United States v. Webb*, 255 F.3d 890, 904 (D.C. Cir. 2001) (citing *Schoeneman v. United States*, 317 F.2d 173, 177 (D.C. Cir. 1963); *Sgro v. United States*, 287 U.S. 206, 210 (1932)). However, Courts need not simply look to the number of days or months between events in determining whether information is stale. Rather they may look to the type of criminal activity alleged, the characteristics of the suspect and the evidence sought, and the nature of the place to be searched. *See United States v. Bruner*, 657 F.2d 1278 (D.C. Cir. 1981) (noting that a court may examine the character of "'the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc.'") (quoting *Andresen v. State*, 331 A.2d 78, 106 (Md. Ct. Spec. App. 1975), *aff'd*, 427 U.S. 463 (1976)).

The D.C. Circuit has upheld searches based on information obtained at least 109 days prior to application for the warrant, though it has expressed some discomfort with delays this

long.[2]  *See, e.g., Webb*, 255 F.3d at 904.  Again, however, the Circuit's decisions have not relied

solely on a numerical calculation of elapsed days.  For example, in *Schoeneman v. United States*,

the court held that probable cause did not exist to believe that unlawfully held classified

documents would be recovered from defendant's home.  The warrant affidavit was based on a tip

that the documents had been seen at the defendant's residence 107 days prior to the warrant

application.  *Schoeneman*, 317 F.2d at 177–78.[3]  In *Webb*, the Circuit upheld a search based on

information 109 days old, but found it "troubling" that the warrant to search for documents

related to narcotics trade was based on information of that vintage.   255 F.3d at 904.

Nevertheless, the *Webb* court upheld the search because, even if the information was too stale to

support a showing a probable cause, the *Leon* good faith exception made suppression

inappropriate.  *Id.* at 904–05.  In support of its finding, the court distinguished *Schoeneman* as

relating to a "single-incident crime."   *Webb*, 255 F.3d at 905 (noting that the warrant in

*Schoeneman* had issued on the basis "solely of an informant's statement that he had seen

classified documents in the defendant's home on [a] single occasion").   In contrast, the *Webb*

affidavit suggested ongoing or recurring narcotics transactions and contained an informant's

statement that Webb had been selling drugs "'for an extended period of time.'"   *Id.*  The court

noted that "[c]ourts have been considerably more lenient in assessing the currency of information

supporting probable cause in the context of extended conspiracies than in the context of single-

incident crimes" and continued that "it would not necessarily have been unreasonable for an

officer to conclude that a longtime drug dealer, whose most recent known deal had occurred

---

[2] Other cases upholding probable cause determinations on the basis of information as much as 3 months old include
*In re Search Warrant Dated July 4, 1977, for Premises at 2125 S St., Northwest, Washington, D.C.*, 667 F.2d 117
(D.C. Cir. 1981) (abrogated on other grounds) and *Andresen v. Maryland*, 427 U.S. 463, 478 n.9 (1976).
[3] Note that Schoeneman was decided before Leon and so the court did not consider Leon's good faith exceptions.

three months earlier, would still retain papers permitting him to get back in touch with his customers or . . . his supplier." *Id.*

Likewise in *United States v. Bruner*, the D.C. Circuit rejected an argument that a January 1978 affidavit was based on stale information when it relied on information from the previous summer or early fall.  657 F.2d 1278, 1298 (D.C. Cir. 1981).  The Court emphasized that the information related to a suspect who had been involved in a drug trafficking conspiracy for six years, that the conspiracy continued to exist, and the suspect lived at the place to be searched.  *Id.* at 1298–99.  The Court also noted that the evidence included in the affidavit (observation of a drug display cabinet in the suspect's home) had long been kept in defendant's residence and that the suspect had expressed his intention to keep the cabinet as long as he sold drugs.  *Id.* at 1299.

### iv.  *Leon* Good Faith Exception

Even where a reviewing court disagrees with the magistrate's finding of probable cause, such disagreement does not automatically suggest the need to suppress evidence uncovered during the search.  In *United States v. Leon*, the Supreme Court confirmed a "good faith" exception to the exclusionary rule.  468 U.S. 897 (1984).  Specifically, the Court held that law enforcement officers may rely on the probable cause determination of the magistrate approving the search warrant.  *Id.* at 922.  As long as the executing officer relied in good faith on the warrant, the exclusionary rule does not apply.  *Id.* at 920.  In fact, the D.C. Circuit has noted that the degree of deference owed by police to the magistrate's probable cause determination is even greater than the "great deference" owed by reviewing courts to that determination.  *Spencer*, 530 F.3d at 1007 ("[T]he 'degree of police deference to the magistrate which is perceived by courts as reasonable under *Leon* exceeds significantly that 'great deference' owed the magistrate by

reviewing courts under Gates.'") (quoting 1 Wayne R. Lafave, Search and Seizure § 1.3(f), at 97–98 (4th ed. 2004)).

The Supreme Court has limited application of the *Leon* "good faith" exception and suppression of evidence remains an appropriate remedy where: (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;"[4] (2) "the issuing magistrate wholly abandoned his judicial role"; (3) the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant was "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923.

Only two of these exceptions to the exception are raised by defendants, namely that the affiant relied, knowingly or with reckless disregard for the truth, on false information and that the affidavit was so lacking in indicia of probable cause as to render it unreasonable to rely on.

There appear to be few cases granting motions to suppress on the basis of the third exception to *Leon* (that the affidavit was so lacking as to render reliance entirely unreasonable). However, the cases appear to include situations where, for example, the affidavit failed to link the suspect to the location to be searched, and failed to explain why the affiant believed evidence of criminal activity would be found at the location, failed to explain why evidence would be present long after officers received relevant information to support the affidavit. *See, e.g.*, *United States v. Johnson*, 322 F. Supp. 2d 35, 39 (D.D.C. 2004). In another case, discussed in more detail below, officers learned 178 days prior to issuance of a warrant that photographs showing illegal activity had been taken in a suspect's home. *United States v. Lindsey*, 596 F.

---

[4] The Court cited Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Supp. 2d 55 (2009).  This Court held that the affidavit at issue was so lacking in indicia of probable cause as to make reliance upon it unreasonable.  The affidavit did not specify when the photographs had actually been taken, and therefore when the criminal activity had occurred.  Moreover, there was no additional corroborating evidence subsequent to the discovery that the photos were taken in Lindsey's home.  Finally, the Court reiterated that the case involved a single-incident crime, rather than an ongoing crime for which evidence of criminal activity would presumably be present in the location to be searched for a longer period of time.

Cases finding that the *Leon* requirements were not met appear to be the exception rather than the rule.  As the D.C. Circuit has noted, "'[w]hen officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish good faith without a substantial expenditure of judicial time.'"  *Spencer*, 530 F.3d at 1007 (quoting *Leon*, 468 U.S. at 924).

### c.  **Defendants' Motions**

#### i.  **Hudson Motions to Suppress [35, 63]**

##### 1.  **Background**

Defendant Terrence Hudson filed two nearly identical motions arguing that the November 10, 2010 search of his home at 6902 Hudson Avenue, Oxon Hill, Maryland, was unlawful and urging suppression of evidence seized pursuant to that search.  Def. Hudson's Mot. Suppress Phys. Evid. 1, ECF No. 35; Def. Hudson's Mot. Suppress Phys. Evid. 1, ECF No. 63.[5] That search resulted in the seizure of various items including a firearm and ammunition; a plate, straw, razor, and scale with residue; various rock-like substances; over $6,000 in cash; and cell phones and documents.  Gov't Omnibus Resp. Defs.' Mots., Ex. 5, at 4–5, ECF No. 111-5.

---

[5] All references are to Hudson's Motion  at ECF No. 63.

Mr. Hudson concedes that he lived at the home searched and this is supported by the information contained in SA Ray's affidavit.  Hudson's Mot. 5.  Hudson thus has standing to challenge the search and seizure.

Hudson argues that the government's warrant affidavit did not establish probable cause.  Hudson's Mot. 5.  Specifically, he points to the affidavit's reliance on admittedly ambiguous wiretapped conversations between Hudson and co-defendant Savoy.  In one such conversation, Savoy told Hudson "I just got a new pair of shoes, I'm getting ready to go in here and try em on right now."  Hudson replied, "Alright, let me know something."  Gov't Omnibus Resp. Defs.' Mots., Ex. 8, at 28, ECF No. 111-8.  Savoy responded that he would "let [Hudson] know in about 40 minutes" and an hour later called to state "we real cool . . . you can run all day if you want to."  *Id.* at 28–29.  Four days later, Savoy called Hudson to ask "What's the word?" Hudson replied, "Oh yeah that's straight right there.  I need to see you when you get out."  *Id.* at 30.  The two then drove separately to a parking lot in Oxon Hill, Maryland where Savoy got into Hudson's vehicle for less than 30 seconds before returning to his own vehicle.  Each then drove away in different directions.  *Id.* at 31.

Special Agent Ray interpreted these conversations to include narcotics code language and to relate not to shoes, but to drugs.  *Id.* at 28–29.  He argued that "try[ing] on" the "shoes" referred to cooking cocaine into cocaine base or crack cocaine to test the quality.  *Id.*  According to SA Ray, Savoy's comment, "we real cool," and Hudson's comment, "that's straight," were references to the satisfactory quality of the drugs Savoy provided Hudson.  *Id.* at 29.  SA Ray also believed that during the meeting in the parking lot, Savoy provided Hudson with another supply of drugs.  *Id.* at 31.

15

Hudson argues that SA Ray's interpretations of the wiretapped conversations amount to "conclusory explanations . . . insufficient to make up for the lack of probable cause" that contraband would be found at Hudson's residence.  Hudson's Mot. 6.  Specifically, Hudson suggests that codes are usually used more than once and that the mention of "a new pair of shoes" in only one call does not support the inference that the phrase was code for drugs. Hudson's Mot. 8.  He argues that more corroboration was necessary to show probable cause that Hudson was part of the conspiracy and that his home would contain illegal drugs or other evidence of criminal activity.  Hudson's Mot. 6.

Hudson goes on to suggest that *Leon*'s good faith exception does not save the allegedly defective warrant because the affidavit was so lacking in indicia of probable cause as to make reliance upon it unreasonable.  Hudson's Mot. 6–7.  Again, Mr. Hudson argues that the affidavit's reliance on coded conversations cannot support the officers' good faith reliance on the warrant.  Hudson's Mot. 8.

## 2.  <u>Probable Cause Existed to Search Hudson's Residence</u>

Hudson's motion downplays or fails to mention several key pieces of information.  First, Special Agent Ray has served on a drug and violent crime squad since October 2008 and, prior to that, was a Public Safety Officer and Detective for approximately eight years with the Highland Park Department of Public Safety in Highland Park, Texas.  Gov't Omnibus Resp. Defs.' Mots., Ex. 8, at 1–2, ECF No. 111-8.  His affidavit provides some eight pages of information detailing his experience, training, and involvement in the present investigation as well as patterns he has observed in other drug trafficking investigations.  *Id.* at 1–8.  As outlined above, his experience and interpretations are entitled to some weight.

Second, two cooperating witnesses informed the FBI that Hudson sold crack cocaine and that he had been seen with defendant Scurry. *Id.* at 21–23. Cooperating Witness ("CW1"), for example, had been cooperating with the FBI since July 2007 and had known Hudson "for a number of years." *Id.* at 21–22. CW1 informed the FBI that Hudson had been selling crack cocaine for "some time," at least since 2007. *Id.* at 22. Although the cooperating witnesses have criminal records and one has been paid for some of "its" cooperation, the information they provided was corroborated "to the extent possible." *Id.* Moreover, the affidavit laid out these facts for the magistrate's consideration. *Id.* at 23.

Third, the affidavit stated that Hudson had two prior charges for possession with intent to distribute a controlled substance and that Savoy, the person with whom Hudson was talking, has two prior charges for possession with intent to distribute cocaine. *Id.* at 10–11. Although the information is not dispositive, a magistrate making a probable cause determination may consider a suspect's prior involvement in the same type of criminal activity being investigated.

Finally, and perhaps most importantly, Hudson's motion fails to mention an intercepted call between Savoy and Hudson on August 4, 2010. According to SA Ray, the two discussed meeting so that Savoy could provide Hudson with "'five,'" which Ray interpreted to mean five 31-gram packages of powder cocaine. *Id.* at 31–32. Savoy and Hudson then met in the parking lot of the House of Chang restaurant in Fort Washington, Maryland. *Id.* A subsequent traffic stop of Hudson by Prince George's County Police resulted in the seizure of five plastic bags each containing approximately 31 grams of powder cocaine from the center console of Hudson's car. *Id.*

Based on a totality of the circumstances, the magistrate's approval of a search warrant for Hudson's home was reasonable. The affidavit supporting the warrant application was based on a

combination of factors, including information from two cooperating witnesses previously determined reliable by the FBI, interpretations of coded conversations by SA Ray, the prior narcotics involvement of both men, two unexplained meetings between Hudson and Savoy in parking lots, and the seizure of five bags of cocaine from Hudson shortly after he had discussed meeting with Savoy to get "five."  These were sufficient to support a finding of probable cause that Hudson was engaged in narcotics trafficking with Savoy.

Furthermore, D.C. Circuit precedent supports the inference that evidence of narcotics trafficking would be found in Hudson's home, despite the fact that most evidence of it was derived from activity that may have taken place elsewhere.  See *United States v. Johnson*, 437 F.3d 69, 71–72 (D.C. Cir. 2006); *Spencer*, 530 F.3d at 1007 ("Common experience suggests that drug dealers must mix and measure the merchandise, protect it from competitors, and conceal evidence of their trade . . . in secure locations.  For the vast majority . . . the most convenient location to secure items is the home.").

Finally, even if probable cause were lacking, the agents relied upon the warrant in good faith.  The Court rejects Hudson's assertion that the affidavit was "so lacking in probable cause" as to render reliance on it unreasonable.  Furthermore, the Court is mindful that "'[w]hen officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish good faith without a substantial expenditure of judicial time.'"  *Spencer*, 530 F.3d at 1007 (quoting *Leon*, 468 U.S. at 924).

For the foregoing reasons, Hudson's Motions [35, 63] to Suppress are DENIED.

### ii.  **Savoy Motions to Suppress [37, 38]**

#### 1.  **Background**

Savoy moves to suppress the introduction of evidence seized during the November 10, 2010 search his residence at 3766 Stonesboro Road, Fort Washington, Maryland.  Def. Savoy's Omnibus Mot. 3–4, ECF No. 37; Def. Savoy's Mot. Suppress Tangible Evid. 1, ECF No. 38. During the search, agents seized a variety of items including what was believed to be over one kilogram of cocaine, two digital scales, multiple firearms and ammunition, and over $35,000 in cash.  Gov't Omnibus Resp. Defs.' Mots., Ex. 7, at 4–6, ECF No. 111-7.

Savoy argues that the affidavit in support of the search warrant contains "multiple representations in the nature of conjecture, inferences and conclusions . . . [and] does not set forth any facts or circumstances pertaining to any participation by Mr. Savoy in any specified . . . act of criminal conduct. "  Savoy's Mot. 2 (emphasis omitted).  Savoy argues that the affidavit "failed to provide the essential specifications of fact and circumstances that might have supported a finding of probable cause."  Savoy's Mot. 3.  Little other detail is provided regarding why probable cause might be lacking.  Savoy requests an evidentiary hearing to "confirm the facts alleged above" and an order suppressing the use of the evidence by the government.  *Id.*

Savoy concedes that the search conducted was of his residence and this is supported by the surveillance information outlined in SA Ray's affidavit.  Savoy's Mot. 4; Gov't Omnibus Resp. Defs.' Mots., Ex. 8, at 48, ECF No. 111-8.  Savoy thus has standing to challenge the search and seizure.

### 2.  Probable Cause Existed to Search Savoy's Residence

The facts supporting probable cause as to Savoy overlap significantly with those supporting probable cause as to two other defendants and one unindicted suspect.  The affidavit incorporates the details of these facts by reference to the sections dealing with the other defendants.  *Id.*  The affidavit refers to a number of calls, detailed above, in which Savoy told

Hudson, he had gotten a new pair of shoes and was going to try them on.  It also refers to the meeting between Savoy and Hudson in the House of Chang parking lot, after which Hudson was stopped with five, 31-gram baggies of cocaine.  The affidavit also refers to calls and a meeting between Savoy and co-defendant Johnson.   On July 27, 2010, Savoy received a call from Johnson in which Savoy stated he "made me a good move last night" and that he "got rid of, well, you know." *Id.* at 44.  The next day, Johnson called Savoy and Savoy said "Hopefully somebody will hit me and clean me up today. . . .  If they do, I will hit you and let you know." *Id.* at 45.  Special Agent Ray believed that in this conversation, Savoy was telling Johnson that he had sold most of the cocaine he had and that he would be ready to buy more from Johnson when another buyer contacted him that day.   *Id.*  About two weeks later, during a call between Johnson and Savoy, Johnson said, "Yea, it's good" and asked "where you want to holler at me?" Savoy responded ". . . I guess the regular" and the two met shortly thereafter in a parking lot in Fort Washington, Maryland.  *Id.* at 46.  They spoke for approximately 10 minutes before each driving away.  *Id.* at 46–47.  Special Agent Ray believed that Johnson provided Savoy with a kilogram of cocaine at this meeting.  *Id.* at 47.  Johnson later called Savoy and Savoy said, "[It] should have been six five and one deuce" to which Johnson replied "Oh yeah, thirty-two right?" *Id.*  Savoy said "The six fives was in two bands and the deuce was in one band down the middle."  *Id.*  Special Agent Ray interpreted this to refer to $32,000 or a price consistent with the retail price for a kilogram of powder cocaine in Washington, D.C. at the time.  *Id.*

The affidavit also describes conversations and a meeting between Savoy and an undicted suspect in which the unindicted suspect told Savoy he needed to see him and Savoy replied, "[Y]ou done already? . . . That joint was cool?"  *Id.* at 50.  The next day, the unindicted suspect and Savoy met in the parking lot at the House of Chang restaurant and the unindicted

suspect walked toward Savoy holding what looked like a white envelope.  *Id.* at 52.  The two met briefly before each driving away.  *Id.*  SA Ray believed the unindicted suspect had sold all of his cocaine, needed a new supply from Savoy, and met Savoy to purchase it.  *Id.* at 50.

In addition to the interpretations of these conversations and meetings, the affidavit outlined Savoy's previous criminal charges and at least one narcotics conviction.  *Id.* at 10.

The totality of the circumstances supports the magistrate's finding that there was probable cause to search Savoy's home.  Perhaps most telling is the meeting between Savoy and Hudson after which Hudson was pulled over and police found five, 31-gram baggies of cocaine. Additionally, the conversations between Savoy and Johnson and between Savoy and an unindicted suspect, while in ambiguous language, support SA Ray's inference that Savoy was purchasing drugs from Johnson and selling them to the unindicted suspect.  This interpretation is further supported by meetings between the parties and the apparent exchange of a white envelope between the unindicted suspect and Savoy.  Special Agent Ray's interpretations of these conversations, in light of his prior experience, is to be given credence.  Finally, Savoy's prior narcotics involvement and the prior narcotics convictions of those with whom he was interacting likewise support the finding of probable cause.

### 3.  *Leon* Good Faith Exception Applies

As with the Hudson warrant, even if the above were not sufficient to establish probable cause, it would be enough to support the agents' good faith reliance on the warrant under *Leon*. The warrant included significant information linking Savoy to the alleged drug conspiracy and officers were able to corroborate at least one alleged drug transaction through the traffic stop of and associated seizure of drugs from Hudson.  There is nothing to suggest that the affidavit was so lacking in indicia of probable cause as to render reliance upon it entirely unreasonable.

### 4.  **Evidentiary Hearing Not Required**

Finally, no evidentiary hearing is needed to address the issue of probable cause.  The probable cause determination was made on the basis of the warrant application and the affidavit provided.  Review of that determination can be made within the four corners of those documents and the defendant's motion.  For this reason, at a hearing on August 14, 2012, the Court denied the request of Savoy and other defendants to call witnesses and noted that the Court would make its determination on the papers.

For the foregoing reasons, Savoy's Motions [37, 38] to Suppress are DENIED.

### iii.  **Scurry Motion to Suppress Evidence Seized from Search of his Room [58]**

### 1.  **Background**

Defendant Scurry argues that the Court should suppress evidence recovered from Room "M" during the November 10, 2010 search of 6902 Dudley Avenue, Oxon Hill, Maryland.  Def. Scurry's Mot. Suppress 1–3, ECF No. 58.  The search resulted in the seizure of a number of items from that room including, an off-white rock substance in the pocket of a pair of jeans, ammunition, and various documents.  Gov't Omnibus Resp. Defs.' Mots., Ex. 5, at 4–5, ECF 111-5.

At the time of the search, Scurry was allegedly residing in this room at the home of co-defendant Terrance Hudson.  Scurry does not concede in his motion that he resided there at the time of the search, instead noting that the affidavit "claim[ed] that [he had] resided at the residence 'as of recent weeks'" and that evidence was recovered from the room he was "said to occupy."  Scurry's Mot. 1–2.  Scurry also does not tell the Court why he has a legitimate expectation of privacy in the room searched.

At the time of approval of the search warrant, significant evidence existed that Scurry was involved in the narcotics trade, including nine controlled buys, many of which were audio- or video-recorded, and numerous wiretapped conversations.  Scurry's primary argument in support of his motion to suppress is that information on which probable cause was based was "stale."  Scurry's Mot. 3.  Specifically Scurry states that the most recent information on which issuance of the warrant was grounded consisted of calls on April 24, 2010, 199 days before the warrant was issued.  Scurry's Mot. 3–4.  He also points to a wiretapped conversation from April 14, 2010 between himself and his wife in which he stated that Hudson had seen a "strange car by his house."  Scurry reported telling Hudson that he was going to "go in the house [and] clean my little dirty room."  Scurry's wife responded "I was praying for both of [y'all] earlier today, saying both of [y'all] need to do something with [y'all] selfs . . . getting [too] old for that nonsense."  Gov't Omnibus Resp. Defs.' Mots., Ex. 8, at 37, ECF No. 111-8.  Scurry replied "You right."  *Id.*  Scurry mentions this exchange to support his claim that no evidence supported any continuing involvement in drug trafficking by November 2010.  Finally, Scurry notes that, during earlier points in the investigation, he had resided elsewhere.  Scurry's Mot. 4.  Scurry alludes to the fact that this might defeat the nexus between the probable cause and the place to be searched.  Scurry's Mot. 4–5.  Scurry argues that the *Leon* good faith exception cannot apply because the warrant was so lacking in probable cause as to render reliance on it unreasonable.  Scurry's Mot. 5.

### 2.  Staleness

Scurry points to a case from this Court, *United States v. Lindsey*, 596 F. Supp. 2d 55 (2009), to support his assertion that evidence supporting his warrant was stale.  In *Lindsey*, the Washington, D.C. Metropolitan Police Department (MPD) obtained photographs of an adult

giving a Glock pistol and a Tec–9 assault pistol to a toddler.  596 F. Supp. 2d at 57.  The MPD determined that the adult was the child's father, executed a search warrant at his residence on August 24, 2006, but did not find either of the pictured weapons.  *Id.*  Evidence later suggested that the photos had been taken in January or February of 2006 in the home of Ricky Lindsey.  *Id.*  Subsequently, another search of Johnson's residence in November 2007 also failed to produce the pictured weapons and on February 7, 2008, an FBI agent obtained a warrant to search Lindsey's residence on the basis of the photographs.  *Id.*  Relying on *United States v. Webb*, the Court held that the warrant for Lindsey's residence, issued at least 178 days after law enforcement personnel learned where they were taken, did not issue upon probable cause.  *Id.* at 59.  The Court noted that this interval was much longer than in *Webb* and that, unlike *Webb*, the case involved a single-incident crime rather than an ongoing conspiracy.  *Id.*  Furthermore, the Court held that the *Leon* good-faith exception did not apply because the affidavit was so lacking in probable cause as to render reliance on it unreasonable.  *Id.* at 60–61.  Specifically, the Court distinguished the case from *Leon* where officers were held to have reasonably relied on a warrant and the affidavit contained an informant's statement that he had seen drugs (i.e. witnessed criminal activity) five months before the search.  Furthermore, the informant's statements were corroborated by observations within the month preceding issuance of the warrant.  In *Lindsey*, officers learned 178 days prior to issuance of the warrant that the photographs had been taken in Lindsey's home.  The affidavit did not include information about when the photographs had actually been taken, and therefore when the criminal activity had occurred.  Furthermore, there was no additional corroborating evidence subsequent to the discovery that the photos were taken in Lindsey's home.  Finally, the Court reiterated that Lindsey involved possession of a weapon, a single-incident crime, rather than an ongoing crime like the drug conspiracy in *Leon*.  *Id.* at 61.

*Leon* itself also involved an affidavit that relied on a five-month old tip.  In *Leon*, the Court held that, although the affidavit did not support probable cause, evidence obtained from the search could nevertheless be admitted during the prosecution's case-in-chief because the officers reasonably relied on the warrant.

### 3.   Scurry Lacks Standing to Challenge Search

Scurry has not met his burden of showing that he has standing to challenge the search of Room M at the Hudson residence.  While the government believes that Scurry had been residing at the house in the weeks leading up to the search and information gleaned during the search suggests he was living there at the time,[6] Scurry refuses to acknowledge that he lived there or even that he had been staying at the home.  Moreover, Scurry makes no argument as to why he may have had a legitimate expectation of privacy in the place to be searched.  As a result, Scurry does not have standing to challenge the search.

### 4.   Evidence Nevertheless Admissible

Even if the Court were to find that Scurry enjoyed standing, the evidence seized during the search would be admissible.  While Scurry raises a legitimate concern regarding the possible staleness of the evidence against him and the Court acknowledges that this is a close case, several facts cut against Scurry and lead the Court to conclude that suppression would be inappropriate (if not based on adequate probable cause, then under the *Leon* good faith exception.

---

[6] A later affidavit by SA Ray, provided in connection with a search warrant for Scurry's vehicles, stated that the owner of the Hudson residence stated that Eric and Keena Scurry were "primarily using a particular bedroom in that residence" and that documents found therein referenced Keena Scurry and included the residence address as her address. Gov't Omnibus Resp. Ex. 8, at 15, ECF No. 111-8.  Additionally, the three Scurry vehicles were seized from outside the residence.  Although these facts support an inference that Scurry was residing at the Dudley avenue residence at the time of the search, it is for the party seeking to suppress evidence of an allegedly unlawful search to establish that he has standing and a "legitimate expectation of privacy" in the searched location.

First, although Scurry cites April 24, 2010 as the last date on which the government acquired information regarding Scurry's involvement in the narcotics conspiracy, this was arguably not the most recent relevant evidence.  The search warrant affidavit outlines calls between Scurry and an unindicted suspect, as well as between Scurry and Hudson, as late as May 19, 2010 and July 13, 2010, respectively.  Gov't Omnibus Resp. Defs.' Mots., Ex. 8, at 59–60, ECF No. 111-8.  These calls linked Scurry to the alleged conspiracy within 174 or 119 days of the warrant, respectively.  Specifically, in a call on April 29, 2010, the unindicted suspect asked Scurry whether he had talked to his "peoples" for him.  *Id.* at 57.  The following day, the unindicted suspect called Scurry to say he was outside and Scurry said he would send his cousin "out there and get it."  *Id.* at 58.  Three minutes later, Scurry called the unindicted suspect and said "You gave him seven or six?"  *Id.*  When the unindicted suspect replied "Six. . . Why would I give him seven?"  Scurry said, "What you mean man, I'm tripping like shit."  *Id.*  He then said he was "about to go up there" and would "let [him] know something about five minutes."  *Id.* SA Ray interpreted this conversation as a transaction between the unindicted suspect and Scurry in which the unindicted suspect paid Scurry (possibly $600) to buy drugs from Scurry's supplier on his behalf.  *Id.* at 58–59.  After being arrested, charged with Possession with Intent to Distribute Cocaine, and briefly jailed, the unindicted suspect spoke with Scurry again on May 19, 2010 about getting in touch with his "peoples" so that he could "keep [his] balling rolling." *Id.* at 59.  SA Ray interpreted these calls to suggest that the unindicted suspect was trying to resuscitate his drug business after being in jail.  *Id.*  Finally, on July 13, 2010, after the unindicted suspect had been re-arrested, Scurry told Hudson, "I finally went and got [his] car today . . . but they took his money. . .  It was still there though, lucky me.  They got a search warrant from the judge saying they . . . wanna search the car because illegal drugs in the car,

some shit.  These [people] did all that, lying, and it was still there." *Id.* at 59–60.  SA Ray interpreted this to mean that Scurry had found drugs stashed in the unindicted suspect's car.  *Id.* at 60.

In addition to these more recent intercepted calls, two cooperating witnesses reported their belief that Scurry had been selling crack cocaine since at least 1992 and 2005, respectively. *Id.* at 21–23.  These contentions are supported by the affidavit's inclusion of Scurry's extensive narcotics convictions, stretching from 1990 to 2009.  *Id.* at 12–13.  The fact that Scurry then participated in nine controlled buys suggests little indication that Scurry planned to cease his narcotics operation.  While Scurry cites the April 2010 conversation with his wife to negate the possibility of probable cause in November, this argument is simply not persuasive enough to counter evidence that Scurry had sold drugs over the past two decades, continued to sell drugs throughout most of this investigation, and was, according to the government, living with one of his alleged co-conspirators at the time of the search.

Unlike a search for a firearm, as in *Lindsey*, searches for evidence of a drug trafficking conspiracy may be based on older information given the continuing nature of that crime and the fact that drug dealers may store inventory and records at their homes for some time.  *See United States v. Hopkins*, 128 F. Supp. 2d 1, 7 (D.D.C. 2000).   When viewed in totality, the evidence appears to be sufficient to support a finding of probable cause.

However, the Court need not decide the issue of probable cause because, even if the search warrant were based on stale information, the good faith exception would prevent suppression of evidence seized during the search.  There was significant evidence linking Scurry to drug trafficking and to the alleged conspiracy.  Scurry's primary argument relates to the potential staleness of this information.  However, unlike in Lindsey, Scurry was charged with a

continuing offense for which the standard with respect to staleness is more relaxed.  Moreover, even if this were a close call, Leon would not require suppression unless the affidavit was so lacking in indicia of probable cause as to render reliance upon it "entirely unreasonable."  That was clearly not the case in this instance.

For the foregoing reasons, Scurry's Motion [58] to Suppress is DENIED.

### iv.  Scurry Motion to Suppress Evidence Seized from Search of His Vehicles [89]

#### 1.  Background

On November 17, 2010, SA Ray applied for, and the court issued, warrants to search three vehicles belonging to Scurry and his wife.  Searches of the vehicles resulted in the seizures of various documents, photographs, GPS devices, and other items.  Gov't Omnibus Resp. Defs.' Mots., Ex. 9, at 4, ECF No. 111-9; Gov't Omnibus Resp., Ex. 10, at 4, ECF No. 111-10; Gov't Omnibus Resp., Ex. 11, at 3, ECF No. 111-11.

Scurry argues that evidence seized from the vehicles, as well as evidence of canine alerts to areas of the vehicles, must be suppressed because the warrants were either based on information obtained from the allegedly illegal use of a GPS tracker on Scurry's GMC Denali or based on stale information.  Def. Scurry's Mot. Suppress Evid. Vehicles 3.  Specifically, Scurry argues that the last fact to establish probable cause occurred 177 days before issuance of the warrant, though it is not entirely clear how he calculated this figure.  Scurry's Mot. 4.  Because the Court determined during an August 2012 hearing that the "independent source" and the inevitable discovery doctrines overcame any concerns related to potentially unlawful use of a GPS, the Court deals now only with Scurry's argument as to probable cause.

While Scurry does not explicitly assert that he has standing to challenge introduction of the evidence seized from the vehicles, however, he asserts that the vehicles are "his."  Suggesting either an ownership or possessory interest in the vehicles.  Moreover, the government's affidavit supporting its warrant application provided extensive information about Scurry's use of the searched vehicles.  While each of the three vehicles was registered in Scurry's wife's name, this would not defeat standing so long as Scurry maintains a possessory interest in the vehicle.  *See, e.g.*, *Williams-Davis*, 1992 WL 26025.  The Court is satisfied that he has met his burden by conceding that the vehicles belong to him and his wife.  Scurry's Mot. 1–2.

### 2.   <u>Probable Cause Likely Existed to Search Vehicles</u>

Again, it is unclear how Scurry calculated that 177 days elapsed between the last fact to establish probable cause and the issuance of the warrant, though it may represent the time between a May 23, 2010 alleged drug transaction in Scurry's GMC Denali, Gov't Omnibus Resp. Defs.' Mots., Ex. 12, at 17, ECF No. 111-12, and the November 17, 2010 issuance of the warrant for all three vehicles.  However, as the Court will point out, subsequent events also supported probable cause to search the Denali and the other vehicles.

The affidavit outlines probable cause with respect to each vehicle separately.  Gov't Omnibus Resp. Ex. 8, ECF No. 111-8.  With respect to a 1998 white van, registered in Keena Scurry's name at Hudson's address, the affidavit stated that the van had been used during two controlled buys in November 2009 and January 2010 and stated that agents had seen the van driven by Scurry between April and July 2010 and parked where Scurry allegedly sold drugs.  *Id.* at 16.  The affidavit also noted that the van bears a business advertisement for the remodeling business SA Ray believed to be a front for Scurry's narcotics trafficking organization.  *Id.*

To support probable cause to search the 2004 grey GMC Denali, registered in Keena Scurry's name, the affidavit cited visual surveillance of the vehicle being used during two alleged drug transactions on April 22, 2010 and May 23, 2010. *Id.* at 17–18. It also noted that agents had, at various times between April and October 2010, seen the vehicle being driven by Scurry and parked where he allegedly sold drugs. *Id.* at 17.

Finally, with respect to a 2006 Silver Chrysler 300, also registered in Keena Scurry's name, SA Ray saw Scurry, at various times between April and October 2010, driving the vehicle and parking it where he allegedly sold drugs. *Id.* at 18.

If this information was the only information provided by the affidavit, the Court might have lingering concerns regarding the potential staleness of the evidence. The most recent evidence with respect to the white van was either a January 2010 controlled buy or a July 2010 sighting of Scurry in the driving or parking the van near where he allegedly sold drugs. With respect to the other two cars, the evidence shows a buy in the Denali on May 23 and sightings of Scurry driving the vehicles and parking them near where he sold drugs in October.

The mere sightings of Scurry parking these vehicles near where he sold drugs, without more, might not particularly support probable cause. Moreover, it may be that a warrant for the search of a car for evidence of drug-related activity must be supported by more recent evidence than a warrant to search a suspect's home. A vehicle, by nature, mobile. Scurry was likely to have used it for many different purposes at many different places during the course of the investigation. Unless routinely garaged, a vehicle is also routinely visible to the public and driven or parked on public roads. While contraband might be hidden in the trunk or other concealed places within the car, it seems far less likely that one engaged in criminal activity would store evidence of his activity in a vehicle for months at a time rather than in his residence.

Indeed, the majority of the background information contained in the affidavit recites the affiant's experience that drug traffickers maintain evidence of their crimes in their *residences*, the residences of friends or family, stash houses, storage facilities, business locations, and other "secure locations."[7]  *Id.* at 3–8.

Nevertheless, the affidavit does state that, in SA Ray's experience, Eric and Keena Scurry used their vehicles to "transport, store and facilitate drug trafficking operations" and that drug traffickers will "often use their vehicles to transport and to store their narcotics as well as the accouterments of their narcotics trade, such as scales, packaging materials, and . . . other items" and will "routinely alternate vehicles in order to elude law enforcement."  *Id.* at 9, 15.  Moreover, the affidavit recites evidence of Scurry's more recent narcotics involvement through presentation of evidence from the search of Scurry's room seven days earlier.  *Id.* at 14.  Specifically, the affidavit provides support for the notion that Scurry resided in that room and details the discovery of 5.6 grams of crack cocaine in the pocket of a pair of pants believed to belong to Scurry.  *Id.* at 14.  Scurry has argued that that the search of his "alleged" room was unlawful and if the court were to find that to be the case, it would not consider the fruits of that search in evaluating probable cause for another search.  However, as already stated, the Court does not hold that the search of Scurry's room was based on less than probable cause and as such, the evidence obtained was lawfully used by SA Ray in seeking a warrant for the search of Scurry's vehicles.

While the presence of crack cocaine in the defendant's room supports only an attenuated inference that evidence of drug trafficking would be found in Scurry's vehicles, the Court assumes that this, combined with Scurry's lengthy, narcotics-related criminal record and

---

[7] Admittedly, the lack of discussion about vehicles may relate to the fact that the background section appears to have been taken from the affidavits to support warrant applications for defendants' residences.  Nevertheless, the affiant must demonstrate probable cause to search the location for which a warrant application has been submitted.

previous use of all three vehicles for his activities, is sufficient to support probable cause to search the vehicles.

### 3. **Leon Good Faith Exception Excuses Any Defect**

Again, however, the court need not decide the issue of probable cause because the search was reasonable under the *Leon* good faith exception. The affidavit was not so lacking as to render reliance upon it entirely unreasonable. SA Ray outlined the basis for his belief that Scurry was engaged in criminal activity and continued to be engaged in such activity leading up to issuance of the search warrant. He also stated the basis upon which he believed that contraband would be found in the vehicles. Once the magistrate accepted these assertions and issued the warrant, officers acted reasonably in relying on it.

For the foregoing reasons, Scurry's Motion [89] to Suppress is DENIED.

### v. **Johnson Motion to Suppress [67]**

#### 1. **Background**

Johnson moves to suppress physical evidence seized during the November 10, 2010 search of his home at 1005 Frimler Court, Capitol Heights, Maryland. Def. Johnson's Mot. Suppress Phys. Evid. 1, ECF No. 67. During that search, agents seized over $10,000 in cash, a digital scale, various electronics including a laptop and several cell phones, photos, and financial documents. Gov't Omnibus Resp. Defs.' Mots., Ex. 6, at 5–6, ECF No. 111-6.

Although Johnson does not explicitly set out the basis for his standing to challenge the search, he concedes that the search was of his home and the government does not dispute that he has standing. Thus the Court finds that he has standing.

Johnson argues that SA Ray's affidavit did not establish probable cause that Johnson had committed a crime nor that evidence of a crime would be found at Johnson's residence.

Johnson's Mot. 3.  Specifically, he argues that the affidavit includes evidence against Johnson in only four of sixty pages, *id.*, and that the conversations excerpted are "highly ambiguous and equally lend themselves to perfectly innocent explanations." *Id.* at 4.  He goes on to point out that, although the affidavit describes a meeting in which Johnson allegedly provided Savoy with one kilogram of cocaine, it does not state that agents observed the transfer of a brick-sized object or that narcotics were seized from either individual after the meeting. *Id.* at 4–5.

More specifically, the affidavit evidence against Johnson consists of four calls intercepted on Savoy's phone and two meetings between Johnson and Savoy at various times between July 27, 2010 and August 13, 2010.  No calls from the September 13 to October 12 wiretap of Johnson's phone were included in the affidavit.  As with other defendants, the calls between Johnson and Savoy consist mainly of coded or ambiguous conversation interpreted by SA Ray.  During a July 27, 2010 conversation between Johnson and Savoy, Savoy told Johnson he had "made me a good move last night . . . got rid of, well you know . . . A little something so it shouldn't be long now. . .  Well, what you want to do?"  Gov't Omnibus Resp., Ex. 8, at 44, ECF No. 111-8.  Johnson responded "Well it you mainly" to which Savoy said, "I'm going to get with you, come right back to you." *Id.*  The next day, Johnson called Savoy and, according to the affidavit asked if he was ready to be re-supplied with cocaine.  Savoy replied, "Soon as a mother fucker get thru to me I'm going to get thru to you" to which Johnson said "Ok . . . I know that's right." *Id.* at 45.  At some point between July 28 and August 13, 2010, intercepted calls suggested Johnson was on his way to meet Savoy at a steak house in Washington, D.C.  Surveillance units saw Johnson enter the steak house for a few moments before exiting the restaurant with Savoy and an unindicted suspect and then talking with Savoy near Johnson's car for "several minutes." *Id.* at 45–46.  Savoy and Johnson then each drove away in separate cars.

*Id.* On August 13, 2010, Savoy called Johnson and, according to the affidavit, asked if Johnson had heard from his supplier. Johnson said "Yea, it's good . . . where you want to holler at me?" After Savoy responded "the regular," Johnson said "I see you down there in maybe 15 minutes." *Id.* at 46. Thirty minutes later the two exited their vehicles in a parking lot in Fort Washington, Maryland and spoke for approximately 10 minutes before each leaving the area. *Id.* Subsequent to this meeting, Johnson called Savoy and Savoy said "It[] . . . should have been six five and one deuce." Johnson said, "Oh, yeah thirty-two, right?" and Savoy stated "The six fives was in two bands and the deuce was in one band down the middle." *Id.* Special Agent Ray stated his belief that Savoy had contacted Johnson on August 13 to ask whether Johnson had received the cocaine he wanted to buy. When Johnson said yes, the two met and Johnson sold Savoy a kilogram of cocaine for $32,000.

Johnson also argues that there is an insufficient basis to support probable cause that evidence of criminal activity would be found *in his home*. Although he acknowledges the *United States v. Thomas* conclusion that "'observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for the residence, if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence,'" Motion at 5–6 (quoting *United States v. Thomas*, 989 F.2d 1252, 1255 (D.C. Cir. 1993)), he distinguishes the *Thomas* warrant as having been based on more recent and more compelling evidence of ongoing narcotics trade, including a recent, corroborated tip from an informant that Thomas was selling drugs and an undercover buy from Thomas. *Id.* at 6 (citing *Thomas* at 1253–54). Though Johnson does not explicitly make the comparison, the most recent information allegedly linking Johnson to a narcotics conspiracy appears to have been 88 days old when the warrant issued. Gov't Omnibus Resp., Ex. 8, at 47,

ECF No. 111-8 (describing a phone call in activation #2677 after the August 13, 2010 alleged cocaine sale).

Finally, Johnson avers that the warrant was so lacking in indicia of probable cause as to render reliance on it unreasonable and to prevent application of the *Leon* good faith exception. Motion at 7.

## 2.  Probable Cause Appears to have Existed to Approve Warrant

The affidavit certainly includes less evidence linking Johnson to the alleged narcotics conspiracy than it provides with respect to most of the other defendants.  The evidence consists primarily of SA Ray's interpretations of Johnson's conversations as well as his prior narcotics-related convictions.  Additionally, Johnson rightly points out the oddity of an alleged daytime transaction of one kilogram of cocaine, in a parking lot under visual surveillance by the FBI, during which agents did not actually report seeing an exchange of money or any object.  Given the size of a kilogram of cocaine, it does seem unlikely that agents would fail to observe the alleged handoff.

However, the Court returns to its earlier statement that probable cause is not to be evaluated on the basis of isolated facts in an affidavit.  The Court must give great deference to the magistrate's determination of probable cause.  The warrant was supported by SA Ray's interpretations, based on his experience, training, and prior involvement with the investigation and these deserve to be credited.  Moreover, the conversations reported in the affidavit, while admittedly vague, took place between two people, Johnson and Savoy whose prior narcotics convictions were listed in the affidavit.[8]  Additionally, Savoy's more recent drug-related

---

[8] The affidavit indicated that both Johnson and Savoy had two prior drug-related convictions in the early 1990s. Gov't Omnibus Resp. Defs.' Mots., Ex. 8, at 10–11.  However, as co-defendant Brown pointed out in a *pro se* filing related to his own motions, the value of two-decade-old convictions to a probable cause determination is questionable.  However, the convictions included in the affidavit are not to be read as dispositive indications of

activities had been corroborated through intercepted calls between Savoy and other alleged co-conspirators and through the traffic stop of Hudson that resulted in the seizure of five baggies immediately following a conversation where Savoy stated he would give Hudson "five."

Based on the totality of the circumstances and the great deference owed by this Court to the magistrate's determination, the Court assumes that probable cause existed with respect to the warrant to search Johnson's home.   However, the Court need not decide the issue because the *Leon* good faith exception excuses any lack of probable cause that might exist in this instance.

### 3. *Leon* Good Faith Exception Would Excuse Any Warrant Defects

Even if the Court were to find that the warrant was not supported by probable cause, the *Leon* good faith exception makes suppression inappropriate.   Johnson has not shown that the agents' reliance on the warrant was unreasonable.   Johnson's Mot. 7.   Although he refers to the affidavit as "bare bones," in fact, it was a 60-page document outlining the affiant's prior experience, the reliability of two cooperating witnesses, the extensive investigations already conducted, the prior drug convictions of all of those being investigated, and the interpreted conversations between the defendants.   While not all of this background material pertained directly to Johnson, much of it, particularly the information regarding SA Ray's prior experience, bolsters the case for a search of Johnson's home as well.   Moreover, as the D.C. Circuit noted in *United States v. Spencer*, "'the police, having turned the probable cause decision over to another person, . . . are generally entitled to presume that the magistrate knows what he is doing.'"   530 F.3d at 1007 (quoting 1 Wayne R. Lafave, Search and Seizure § 1.3(f), at 97 (4th ed. 2004)). Based on the weight given by D.C. Circuit and United States Supreme Court cases to law

---

criminal activity and are merely one factor in a totality of the circumstances analysis.  Given the other factors supporting the probable cause determination, or at least application of the good faith exception, as to Johnson, the Court need not elaborate further on the value of these convictions to the probable cause determination.

enforcement reliance on warrants approved by neutral and detached magistrates, this Court holds that suppression of evidence seized from Johnson's home would be inappropriate.

For the foregoing reasons, Johnson's Motion [67] to Suppress is DENIED.

### vi.   Robinson Motion to Suppress Evidence Seized During Search [201]

#### 1.   Background

Robinson moves to suppress evidence seized from the November 10, 2010 search of 4331 4th Street, S.E., Apt. 2, Washington, D.C.   Def. Robinson's Mot. Suppress Evid. 1, ECF No. [201].   That search resulted in the seizure of two bags of a rock-like substance, one bag of a white powdery substance, $3021 in cash, mail addressed to Nathan Robinson, and various other items, all from Room "C" with the exception of three photos from Room "A."   Gov't Omnibus Resp. Defs.' Mots., Ex. 2, at 5, ECF No. 111-2.   The search warrant receipt does not specify whether the mail was addressed to Robinson at 4331 4th Street or to another address.   *Id.* Robinson was on the premises at the time of the search and was arrested.   Robinson's Mot. 2.

Robinson argues that he did not live at the residence searched.   Robinson's Mot. 3.   In support of this contention, Robinson attaches affidavits from his grandmother stating that he has lived with her since June or July 2005 and from Raesheeda Ball, a resident of the place searched, stating that he has not lived there since being released from prison in June 2005.   Robinson's Mot., Ex. 3.   He also attaches a copy of his District of Columbia driver's license listing another District location as his address.   *Id.*   Robinson does not state whether the seized items belonged to him nor does he explain the reason for his presence in the apartment at the time of the search other than to say he had a "relationship with someone" that lived there.[9]

---

[9] The government contends that Robinson was dating Raesheeda Ball, the lessee of the residence and that he lived with her there.

Robinson also contends that the search did not meet the standards of *Franks v. Delaware*, 438 U.S. 154 (1978), that "no evidence" suggests he was involved in a conspiracy or selling narcotics in the 4200 block of 4th Street, S.E., and that there was no evidence included in the affidavit to establish probable cause that "evidence and instrumentalities of violation of the law [would be found at the premises.]" Robinson's Mot. 2–3. Finally, during oral argument at the Court's August 2012 motions hearing, Robinson's counsel emphasized that the interactions between the defendants provided little support for a probable cause determination because the defendants know each other and are likely to talk or meet for perfectly innocent purposes.

The government counters that evidence was set forth in the search warrant affidavit to suggest that Robinson lived at the searched location. Gov't Omnibus Resp. 61–62, ECF No. 109. Specifically, Robinson had been arrested for a narcotics offense in a stairwell of the building, his car had been seen parked in front of the building early on the morning of June 17, 2010 and on multiple occasions between April and November 2010, and wiretapped conversations suggested that he lived with "Ray-Ray," or Raesheeda Ball, the lessee of the apartment searched. Gov't Omnibus Resp., Ex. 3, at 24, ECF No. 111-3. The government also argues that, if Robinson does not in fact live at this address, he lacks standing to challenge the search. Gov't Omnibus Resp. 60–61, ECF No. 109.

## 2. <u>Robinson Lacks Standing to Challenge Search</u>

Although Robinson claims that he did not live at the apartment searched, he fails to provide a basis upon which the Court could find that he nevertheless had a legitimate expectation of privacy in the apartment. He has implied, but not stated, that he was legitimately on the premises. He also has not claimed that he was an "overnight guest" there, though it is possible that he was since he was found in the apartment at shortly after 6:00 a.m.

As mentioned above, the party moving to suppress evidence derived from an unlawful search bears the burden of demonstrating that he has standing. *See, e.g.*, *United States v. Hicks*, 978 F.2d 722 (D.C. Cir. 1992) (holding that, in the context of a pre-trial motion to suppress, the district court correctly declined to consider defendant's Fourth Amendment claims where he failed to carry his burden of showing that his own Fourth Amendment rights had been violated).

Because Robinson has failed to allege that he had a legitimate expectation of privacy in the place searched and thus lacks standing his motion is DENIED.

For the foregoing reasons, Robinson's Motion [201] to Suppress is DENIED.

### vii.  **Brown Motion to Suppress Evidence Seized During Search [101]**

#### 1.  **Background**

Defendant Brown moves to suppress evidence obtained pursuant to a search of his home at 851 48th Street, NE, Apartment A.  Def. Brown's Mot. Suppress Evid. 1, ECF No. 101. During that search, the government seized a digital scale, phones and other electronics, paperwork, and photos.  Gov't Omnibus Resp. Defs.' Mots., Ex. 4, at 4–5, ECF No. 111-4.

Brown asserts that he has standing to challenge the legality of the search based on the fact that he resided in the place searched.  Brown's Mot. 2.  The Court is satisfied that Brown has met his burden to establish standing.

Brown argues that the affidavit upon which the search warrant was granted failed to establish probable cause as to him and his residence and that the *Leon* good faith exception does not apply.  Brown's Mot. 2–3.

Affidavit evidence to support probable cause as to Brown included three phone calls and one meeting between Savoy and Brown, all taking place on August 11, 2010.  Specifically, just after 5:00 p.m. that day, Savoy called Brown and asked "What did he say?"  Brown responded,

"He says yea, he got it . . . he [is] going out of town tomorrow so . . . he said whatever gotta do I'm gonna do it today."  Gov't Omnibus Resp., Ex. 3, at 31–32, ECF No. 111-3.  Savoy then asked, "we . . . talking 44 right?"  *Id.* at 32.  Brown affirmed and said "I don't know why that shit seem so fucking loud, man. . . . why . . . so high that number?"  *Id.*  Savoy then stated, "You know what I'm gonna give him? . . . 4375 . . . because if you break it all the way down to what I be doing when I was doing it with him that what it come to."  *Id.*  SA Ray interpreted this conversation to mean that Brown had talked with a supplier who agreed to sell them drugs for $4400, which Savoy and Brown considered high.  *Id.*  Later that night, Savoy and Brown met briefly near Brown's residence and then each drove away.  Savoy noticed a surveillance unit and called Brown to alert him to the presence of the unit.  *Id.* at 32–33.  SA Ray believed that the two met to complete a drug transaction.  *Id.* at 33.

Brown contests SA Ray's interpretations of his wiretapped conversations.  For example, he argues that Ray's interpretation of "44" as the referring to the price of cocaine is a "conclusory explanation[]."  Brown's Mot. 3 (citing *United States v. Feliz*, 20 F. Supp. 2d 97, 104 (D. Me. 1998); *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996).  More was needed, he argues, to establish probable cause that he was part of a conspiracy and that evidence of criminal activity would be found at his home.  *Id.*  In a *pro se* reply to the Government's Omnibus Response to Defendant's Legal Motions, Brown also suggests that the evidence as to him was stale, consisting of "surveillance of a single-incident alleged drug transaction" three months before issuance of the search warrant.  Def. Brown's *Pro Se* Reply (Second) to Gov't Omnibus Resp., Ex. 1, ECF No. 156-1.

Finally, Brown contends that the *Leon* good faith exception does not apply because the affidavit was so lacking in indicia of probable cause as to render belief in it unreasonable. Brown's Mot. 3–4.

## 2.   <u>Affidavit to Search Brown's Home May Not Have Established</u>   <u>Probable Cause</u>

The affidavit evidence against Brown is the least persuasive of the six current defendants. Although it is roughly on par with Johnson's, the evidence appears to just fall short of that necessary to establish probable cause.  Like Johnson, the evidence against Brown is based almost solely on a handful of intercepted phone calls and one meeting with co-defendant Savoy.  *See* Gov't Omnibus Resp. Defs.' Mots., Ex. 3, at 31–33, ECF No. 111-3.  Like Johnson, Brown has prior narcotics convictions, the last of which is nearly twenty years old.  *Id.* at 19–20. Additionally, Brown, like Johnson, had what SA Ray interpreted to be coded conversations with co-defendant Savoy.  *Id.* at 31–33.  However, two factors distinguish the determination of probable cause with respect to Brown from that with respect to Johnson.  First, the affidavit accompanying the warrant application to search Brown's home did not include the additional corroborating information that bolstered the inference that Brown's alleged co-conspirator Savoy was involved in narcotics trafficking.[10]  Second, the three calls and one meeting detailed between Brown and Savoy all occurred over the course of an approximately five-hour period, three months prior to application for the warrant.  *Id.*  The evidence regarding Johnson, while not

---

[10] Brown resided in the District of Columbia and a warrant application was submitted to the U.S. District Court for the District of Columbia to search his residence as well as that of co-defendant Robinson and another unindicted suspect.  However, the warrant application and accompanying affidavit for the search of Savoy's and Hudson's residences was submitted to the U.S. District Court for the District of Maryland.  Because of this, the affidavit with respect to Brown did not include information regarding the alleged drug transaction between Savoy and Hudson and the subsequent traffic stop of Hudson and seizure of five baggies of cocaine.

significantly more probative, at least occurred over the course of more than two weeks, thereby suggesting some level of continuing activity and involvement in the alleged conspiracy.

A handful of calls and one meeting on a single day, accompanied by 20-year old convictions may not be enough, even with SA Ray's informed interpretation of the calls, to support the search of defendant's home three months later.   However, because of the applicability of the *Leon* good faith exception, the Court does not decide today whether the affidavit established probable cause.

### 3. *Leon* Good Faith Exception Excuses Any Defects

Again, cases from our Circuit suggest that application of the *Leon* good faith exception is the "basic rule."   Against this backdrop, this Court finds that, once a magistrate approved issuance of the warrant, officers were entitled to reasonably rely on it absent defects significant enough to make reliance unreasonable.   *See Spencer*, 530 F.3d at 1007 ("'[T]he police, having turned the probable cause decision over to another person, . . . are generally entitled to presume that the magistrate knows what he is doing.'") (citation omitted).   While the affidavit as to Brown is an extremely close case, the Court finds that it was not so lacking in indicia of probable cause as to make reliance upon the warrant unreasonable.

For the foregoing reasons, Brown's Motion [101] to Suppress is DENIED.


### III.   Hudson Motion to Suppress Statements [76]

#### a.   Background

Hudson moves to suppress statements he made to agents during the search of his home on November 10, 2010 and all testimony derived from those statements.   Def. Hudson's Mot. Suppress Statements 1–3, ECF No. 76.

At 6:00 a.m. on the morning of November 10, agents and officers from the FBI and the Prince George's County Police Department (PGPD) forcibly entered Hudson's home after receiving no response from a knock and announce at the front and back doors.  Hudson's Mot. 2.  The officers and agents were armed and wore tactical gear.  Hudson's Mot. 2.  Special Agent ("SA") Hanna of the FBI was the search team leader for the search.  She testified at the August 14, 2012 motions hearing that approximately sixteen SWAT team members secured the home before the search team entered.   Upon entering, they encountered several adults, including Hudson who was sitting on a couch in the basement, and one juvenile.  The facts are somewhat unclear, but it appears that Hudson and the other adults present were handcuffed and told to sit in or near the living room.[11]  Gov't Omnibus Resp. Defs.' Mots. 84, ECF No. 109.  SA Hanna testified that she pulled Hudson aside before beginning the search.  She was at that time accompanied by a PGPD officer.  Both the officer and Agent Hanna were armed and, according to testimony, their weapons were visible though not drawn.  Special Agent Hanna asked Hudson whether there was any contraband in the house, and Hudson responded that there was a handgun in a cabinet in his room along with cocaine that was "already done."[12]  Hudson's Mot. 2, Gov't Omnibus Resp. 84.   When SA Hanna asked whether "already done" referred to the cocaine having been converted to crack, Hudson said yes.  Hudson's Mot. 2.  Finally, SA Hanna asked Hudson whether his room was the one in the basement with the "Sabiato" bag and double bed and Hudson responded in the affirmative.  Gov't Omnibus Resp. 84.  After the search uncovered contraband including a gun and narcotics, Hudson was arrested.

---

[11] Mr. Hudson's motion states that two adults and the juvenile were escorted out of the home and that Hudson was "detained away from the residence."  The government's motion states that three adults, other than Hudson, and one juvenile were encountered at the home but it does not detail whether any or all of them, besides Hudson were handcuffed.  At the motions hearing, Special Agent Hanna suggested that three adults, in addition to Hudson, were handcuffed and told to sit in or near the living room.

[12] At the August 2012 motions hearing, Hudson denied having answered any of SA Hanna's questions, stating that the agents had knocked in the front and back doors of his home, that damage had already been done, and that he had no reason to help them find anything in the home.

None of the officers or agents present during the search *Mirandized* Hudson.  Hudson's

Mot. 2.  There are conflicting accounts of why SA Hanna asked Hudson about the presence of

contraband.  The government's opposition suggests that SA Hanna wanted to minimize any

damage to the home (which Hudson shared with his mother and others).  Gov't Omnibus Resp.

84.  During the motions hearing, SA Hanna confirmed this desire but also stated that she wanted

to ensure the safety of the agents conducting the search.

Hudson appears to make two arguments to support his motion to suppress.  First, he

argues that the statements were not voluntary.  Hudson's Mot. 3 (citing *Culombe v. Connecticut*,

367 U.S. 568, 602 (1961); *Lego v. Twomey*, 404 U.S. 477 (1972); *Mincey v. Arizona*, 437 U.S.

385, 402 (1978).  Second, he argues that his statements be suppressed because they were given in

response to a custodial interrogation without *Miranda* warnings.  Hudson's Mot. 3.

### b.  <u>Voluntariness and *Miranda*</u>

Confessions are admissible only if they are the product of the defendant's free will.  *See*

*Colorado v. Connelly*, 479 U.S. 157 (1986).  Evidence from involuntary confessions obtained as

a result of "police overreaching" may be inadmissible under the due process clause.  *Id.* at 163–

65.  In fact, the Supreme Court has held that "coercive police activity is a necessary predicate to

the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of

the Fourteenth Amendment."  *Id.* at 522.  Though "[f]ailure to administer *Miranda* warnings

creates a presumption of compulsion," *Oregon v. Elstad*, 470 U.S. 298, 307 (1985), the failure

to provide *Miranda* warnings does not automatically make a confession involuntary.  *New York*

*v. Quarles*, 467 U.S. 649, 690, 104 S. Ct. 2626, 2650, 81 L. Ed. 2d 550 (1984).

With respect to Hudson's *Miranda* arguments, the Fifth Amendment privilege against

self-incrimination applies to custodial interrogation by law enforcement.  *Miranda v. Arizona*,

384 U.S. 436, 467–68 (1966).  *Miranda* applies when a defendant is in "custody" and makes a statement in response to government "interrogation."  *Id.*

For purposes of *Miranda*, "custody" is not limited to formal arrests, but includes restraints on freedom of movement that are the functional equivalent of a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983).  This is an objective standard not based on how the suspect or law enforcement officer actually perceives the interaction.  *Stansbury v. California*, 511 U.S. 318, 323 (1994).  The Supreme Court has phrased the inquiry as whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112, (1995).

Custody need not include detention in a police facility and may even be found to exist in one's own home or bedroom.  *See Orozco v. Texas*, 394 U.S. 324, 326–27 (U.S. 1969) (holding that defendant was in custody when police entered suspect's bedroom at 4:00 a.m. and questioned him and where, at trial, an officer testified that the suspect had been "under arrest" from the time the officers entered the bedroom and was not free to leave).  Other Circuits, in considering whether in-home questioning amounted to custodial interrogation have looked at "the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'"  *United States v. Craighead*, 539 F.3d 1073, 1083–84 (9th Cir. 2008) (noting its adoption of this standard and citing the use of a "police-dominated atmosphere" benchmark by the First, Seventh, Eighth, and Tenth Circuits).

Interrogation may include express questioning or its functional equivalent.  *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).  Put differently, interrogation may include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that

the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (footnote omitted).

While individuals subjected to custodial interrogation are due the procedural protections of *Miranda*, there are exceptions to the *Miranda* requirements. For example, officers may question a suspect without complying with *Miranda* where important public safety concerns are at issue. *See New York v. Quarles*, 467 U.S. 649, 655–56 (1984) (noting that existence of a "public safety" exception to the requirement for *Miranda* warnings that does not depend on the subjective motivations of the officers involved). Law enforcement may also ask routine booking and processing questions regarding "'biographical data necessary to complete booking or pretrial services.'" *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990).

Barring the applicability of any exception, failure to provide *Miranda* warnings prior to custodial interrogation violates the requirements set forth in *Miranda*. *Miranda*, 384 U.S. at 444. Statements obtained in violation of these requirements will generally be inadmissible. *Id.* ("[T]he prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.") However, such statements may be used for purposes of impeachment, *Oregon v. Elstad*, 470 U.S. 298 (1985). Additionally, the *Miranda* exclusionary remedy applies only to the statements themselves and not to evidence obtained as a result of the statements. *United States v. Patane*, 542 U.S. 630, 641–42 (2004).

### c. **Hudson's Statements Were Not Involuntary But Should be Suppressed Under *Miranda***

Hudson's arguments with respect to the voluntariness of his statements can be disposed of fairly quickly. The primary cases upon which Hudson relies, *Mincey* and *Culombe*, involve

46

vastly different fact patterns.  For example, in *Mincey*, statements were found to be involuntary when made by defendant while in the hospital intensive care unit, while in great pain, depressed, "encumbered by tubes," and unable to escape the officer's interrogation (which persisted even after Mincey stated that he did not want to talk further without a lawyer).  *Mincey*, 437 U.S. at 399–401.  Similarly, *Culombe* involved statements by a defendant with a mental age of about nine years old, who was detained by police and interrogated repeatedly over five days and four nights.  *Culombe*, 367 U.S. 568.  Hudson's statements and the surrounding circumstances bear no similarity to these cases.  There is also no indication here that SA Hanna or other agents engaged in the kind of overreaching with which these cases are concerned.  Accordingly, the Court does not find that Hudson's statements were involuntary.

With respect to Hudson's *Miranda* claims, at issue is whether SA Hanna's interaction with Hudson constituted "custodial interrogation" and, if so, whether any exception to Miranda applied which made it unnecessary for her to provide Hudson with a Miranda warning.

The government makes much of the fact that Hudson was in his own home when SA Hanna questioned him and thus should have felt comfortable in the familiar surroundings.  They also point to SA Hanna's demeanor, emphasizing that she never raised her voice to Hudson or in any way attempted to intimidate him.

Nevertheless, the government's argument ignores the fact that some sixteen agents had broken through the front and back doors of his home at 6:00 a.m. when most people would be sleeping or just waking up.  Hudson was handcuffed, along with his family members in the living room.  He had to be accompanied by agents to the restroom.  He was questioned by armed law enforcement officials whose weapons were visible.  Although he was in his own home, it is clear

that he was not free to move about the home and a reasonable person in his position would not have felt free to terminate the encounter with SA Hanna.

Special Agent Hanna's questions constituted interrogation for purposes of Miranda. Hanna asked Hudson questions about which room was his, whether any contraband would be found in the house, and whether the cocaine he mentioned had been cooked into crack. All of these questions were reasonably likely to produce an incriminating response. Telling agents which room was his would implicate him if any contraband was found in that room. The Court need not explain how asking about the presence of contraband in the house might lead to an incriminating response. Finally, asking Hudson whether the cocaine had been cooked into crack arguably would produce a response that bears on the types of charges that might be levied against Hudson.

Moreover, SA Hanna's questions do not fall within the public safety or routine booking exceptions to *Miranda*.

Although SA Hanna stated that the safety of officers and others in the home was part of her motivation in asking Hudson about the presence of contraband in the house, her subjective motivations do not determine whether such questions fall under the "public safety" exception to *Miranda*. Unlike the situation in *Quarles*, where officers believed that a rape suspect had hidden a gun in the supermarket he had just entered, this case involves the search of a home that had already been secured by SWAT team members. There was no danger that "an accomplice might make use of [the gun, or that] a customer or employee might later come upon it." *Quarles*, 467 U.S. at 657. Rather, the search was being conducted in the suspect's home by trained agents. Although officer safety is certainly important, these agents presumably had experience searching for firearms and could seize these items with minimal danger to themselves or others.

*United States v. Peterson*, 506 F. Supp. 2d 21 (D.D.C. 2007) involved a nearly identical fact pattern to the situation here.  In that case, officers executed a search warrant at the defendant's home at approximately 7:00 a.m.  When there was no response to their knock and announce, they forcibly entered the home, handcuffed the two adult men in the home and seated them in the living room on a couch and briefly interviewed them.  *Id.* at 22.  The defendant was not read his *Miranda* rights prior to questioning.  The district court held that the totality of the circumstances suggested that the defendant was in custody for purposes of *Miranda*.  *Id.* at 23.  While acknowledging that handcuffing did not, *per se*, equate to custody, the Court pointed to the presence of five officers plus a SWAT team, the use of a battering ram to break through the door, and the fact that officers had weapons drawn and visible.  *Id.* at 24.

The Court in *Peterson* also held that not all of Peterson's statements were admissible as responses to routine booking questions.  The court suggested that the routine booking exception was limited to questions such as those related to biographical information to complete forms, address and ownership interests, and employment and marital status.  *Id.* (citing *Muniz*, 496 U.S. at 601–02; *Gaston*, 357 F.3d at 82.  However, the court held that asking Peterson which bedroom was his did not relate to administrative concerns falling within this exception and was designed to illicit an incriminating response.  *Id.* at 25.

On at least two occasions, the D.C. Circuit has considered, but declined to reach, the question of whether *Miranda* warnings were required in similar situations.  *See, e.g.*, *United States v. Harris*, 515 F.3d 1307 (2008); United States v. Gaston, 357 F.3d 77 (D.C. Cir. 2004).

In *Harris*, for example, officers executing a search warrant of defendant Harris's apartment, handcuffed Harris and two other adults inside, and an officer escorted Harris to a hallway and asked whether there was anything in the residence "that [he] should know about[.]"

*Id.* at 86.  Harris then disclosed that there were two guns in the bedroom.  *Id.*  On appeal, Harris argued that her conviction should be vacated because the officer had violated her Fifth Amendment rights by questioning her without apprising her of her *Miranda* rights.  Given that any error was harmless, the court did not reach the question of whether the officer had subjected Harris to "custodial interrogation."  In a citation, the court acknowledged conflicting precedent from two circuits, comparing *United States v. Bautista*, 684 F.2d 1286, 1292 (9th Cir.1982) (finding that a suspect questioned after being handcuffed during a Terry stop was not "in custody" for *Miranda* purposes), with *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("[A] reasonable person finding himself placed in handcuffs by the police would ordinarily conclude [he was] in custody.").

Thus, although D.C. Circuit precedent does not appear to dictate a particular result, the Court holds that this situation constituted custodial interrogation and that the agents' failure to provide Hudson with an adequate warning regarding his rights violates the *Miranda* requirements.  As a result, Hudson's motion to suppress his statements is GRANTED.  However, given that the *Miranda* remedy is limited to the suppression of statements, and not to the physical fruits of those statements, the government may introduce physical evidence seized during the search of Hudson's home.

For the foregoing reasons, Hudson's Motion [76] to Suppress Statements is GRANTED.

## IV.   <u>Savoy Motion for Pretrial Hearing [36]</u>

### a.   <u>Background</u>

Defendant Savoy moves for a pre-trial hearing to require the government to produce evidence of the existence, scope, and duration of the alleged conspiracy and on the admissibility

of tape recordings. Def. Savoy's Omnibus Mot. 4, ECF. No. 36. Citing Fed. R. Evid. 104(a) and (b) he states that the Court has discretion to make preliminary determinations of fact relating to the admissibility of evidence. *Id.* The thrust of Savoy's argument seems to be that, because defendants are charged with conspiracy, much of the evidence will not be relevant unless the conspiracy is actually demonstrated. *Id.* By way of example, Savoy suggests that a pre-trial determination of the existence, scope, and duration of the conspiracy is necessary to determine whether co-defendant statements may come in under the co-conspirator exception to the hearsay rule. *Id.* Savoy provides no authority or legal argument as to why a hearing should be granted as to the admissibility of tape recordings.

### b. Pre-Trial Hearing Not Required

Federal Rule of Evidence 801(d)(2)(E) provides that statements made by co-conspirators made in furtherance of a conspiracy are not hearsay and are admissible against all co-conspirators. *United States v. (Joseph) Jackson*, 627 F.2d 1198, 1216 (D.C. Cir. 1980). To admit such statements, the prosecution need only establish by a preponderance of the evidence that a conspiracy existed and that the statement was made in furtherance of that conspiracy. *United States v. Beckham*, 968 F.2d 47, 51-52 (D.C. Cir. 1992) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).

However, the Court need not conduct a pre-trial determination of the existence of a conspiracy to determine the admissibility of such statements. See *United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994); *United States v. Gantt*, 617 F.2d 831, 845 (D.C. Cir. 1980) (upholding trial court's refusal to hold a pre-trial hearing into the existence of a conspiracy so as to determine admissibility of statements under coconspirators' exception to hearsay rule); *United States v. Edelin*, 128 F. Supp. 2d 23, 45-46 (D.D.C. 2001) (holding that a "hearing to make an

advance determination of conspiracy is unnecessary for the Court's determination by a preponderance of evidence that a conspiracy existed").

The government points to prior D.C. Circuit precedent suggesting that while pre-trial determinations of a conspiracy may be preferable, for example in determining the admissibility of wire communication recordings, this is not always possible.  *See United States v. Jackson*, 627 F.2d 1198 (D.C. Cir. 1980).   In *Jackson*, the Court noted that hearsay evidence may be admitted subject to connection.   The Court noted the impracticability of taking witness testimony in a piecemeal approach and waiting until the establishment of the conspiracy to recall the witnesses to testify to hearsay declarations of co-conspirators.   "As a concession to such practical impediments that arise during trial, the court is vested with considerable discretion to admit particular items of evidence subject to connection." *Jackson*, 627 F.2d at 1218 (internal citations omitted).

The D.C. Circuit has separately noted that "a decision on a motion should be deferred, if disposing of the motion involves deciding issues of fact that are inevitably bound up with evidence about the alleged offense itself." *United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994).  The Circuit has specifically upheld a trial court's refusal to hold a pre-trial hearing into the existence of a conspiracy to determine admissibility of statements under the co-conspirator exception to the hearsay rule. *United States v. Gantt*, 617 F.2d 831, 845 (D.C. Cir. 1980).  The court explained that "to avoid what otherwise would become a separate trial on the issue of admissibility, the court may admit declarations of co-conspirators 'subject to connection.'" *Id.*; *see also Jackson*, 627 F.2d at 1218 (trial courts are not required to hold "mini-trials" on the conspiracy issue before the conditional admission of a co-conspirator's statements); *Edelin*, 128 F. Supp. 2d at 45–46.  Finally, in *United States v. White*, the Circuit noted that trial exigencies

will often make it impracticable to prove the existence of a conspiracy before hearsay is admitted and it reiterated its endorsement of the "traditional 'subject to connection' approach.'"  116 F.3d 903, 915 (D.C. Cir. 1997) (citation omitted).

In concluding, the Court notes that the government has communicated its intent to elicit only those statements that will satisfy admissibility requirements.  Gov't Omnibus Resp. Defs.' Mots. 108, ECF No. 109.   The government rightly points out that defendants may raise objections at trial to the admission of particular statements.  *Id.*

Given the foregoing, Savoy's Motion [36] for a Pretrial Hearing is DENIED.

### V.   Scurry Motion to Compel Disclosure of Information Regarding Confidential Informants, Witnesses, and Cooperating Criminals [53]

#### a.   Background

Defendant Scurry moves, pursuant to Federal Rules of Criminal Procedure 12(d)(2) and 16 to compel the government to disclose the identities of government witnesses who may be considered informants or cooperating individuals, as well as background information about each including the files maintained by the investigating agency regarding each witness.  Def. Scurry's Mot. Compel Disclosure 1, 3, ECF No. 53.   Scurry argues that this information is "vital to preparation of [his] defense."  Scurry's Mot. 2.  Scurry notes that the government is required to provide information regarding benefits or promises made to such witnesses but expresses concern that communication gaps between investigating agents and government attorneys may result in the inadvertent failure to provide this information to defendants.  *Id.*

#### b.   Legal Standard

As a general rule, the prosecution has a limited privilege to withhold the identity of an informant from an accused criminal defendant. *McCray v. State of Ill.*, 386 U.S. 300 (1967); *Roviaro v. United States*, 353 U.S. 53, 59 (1957). However, this privilege is limited to the identity of the informant and other information necessary to protect the "public interest in law enforcement." *Roviaro*, 353 U.S. at 59. The privilege also does not apply where the identity or other information about the informant has already been communicated to "one who would have cause to resent the communication," *Roviaro*, 353 U.S. at 60, or where fairness mandates disclosure because it is "relevant and helpful to the defense of an accused" or "essential to a fair determination of a cause." *Roviaro*, 353 U.S. at 60–61.

To overcome this privilege, the defendant bears the burden of demonstrating the potential relevance of the information to his defense. Once the defendant has done this, the trial court has discretion to compel the disclosure of the identity of an informant. *United States v. Fields*, 113 F.3d 313 (2d Cir. 1997); *Sandoval v. Aaron*, 562 F.2d 13 (10th Cir. 1977). The trial court must balance the "public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro*, 353 U.S. at 62. Factors to be considered include: the charged crime, defenses to that crime, the possible significance of testimony by the informer, how involved the informant was in the alleged crime, whether disclosure of the informant's identity would help the defense, and the interests in nondisclosure. *Rovario*, 353 U.S. at 629. An informant's involvement in the alleged criminal conduct, for example, as a participant in or as a material witness to an unlawful transaction may suggest the need for disclosure of the name and address of that informant.

In *United States v. Celis*, the D.C. Circuit noted that the disclosure of government witness lists has due process implications and requires balancing of the nature of the private interest with

the value of any additional safeguards and the impact on the government's interests.  608 F.3d

818, 828–29 (D.C. Cir. 2010).    It also may implicate Sixth Amendment confrontation

protections, depending on the timing of any disclosure.  *Id.* at 829 (citing *Smith v. Illinois*, 390

U.S. 129, 131–32 (1968).  With respect to the government's duty under *Brady* to disclose all

exculpatory evidence, the *Celis* court stated that "'[i]t does not follow from the prohibition

against concealing evidence favorable to the accused that the prosecution must reveal before trial

the names of all witnesses who will testify unfavorably."  *Celis* at 831 (quoting *Weatherford v.*

*Bursey*, 429 U.S. 545, 559 (1977))).   Additionally, the court in *Celis* noted that a proposed

amendment to the Federal Rules of Criminal Procedure that would have required disclosure of

witness lists was defeated.  *Id.*  "'The constitutional right to cross examine has never been held to

encompass a right to pretrial disclosure of prosecution witnesses.'"  *Id.* (quoting *United States v.*

*White*, 116 F.3d 903, 918 (D.C. Cir. 1997)).  This is particularly the case where there are security

concerns for the witness.  *Id.* (quoting *White*, 116 F.3d at 918).

### c.  <u>Scurry Not Entitled to Pre-Trial Disclosure of Witness Identities</u>

Although the government is correct that it enjoys a privilege against providing witness

identities, sixteen of the twenty counts against Scurry appear to be based on controlled buys

conducted through the government's cooperating witness.   This witness, while considered

reliable by the government, has an extensive criminal history, including previous narcotics

convictions.  Moreover, the witness has been paid for "its" cooperation.

Given the importance of this witness to proving the charges against Scurry, the identity of

the witness is relevant to Scurry's preparation for trial.   However, Scurry has already been

provided with audio and video recordings of the controlled buys with this witness.  Presumably,

Scurry is now aware of the witness's identity.

Moreover, it is this Court's practice to require the government to turn over all Jencks Act material on the Friday before a government witness is to testify.  This material would include the identity of the witness.

Given that Scurry has already been provided with audio and video recordings of the controlled buys and given that he will receive additional Jencks Act material before the government witness testifies, Scurry's Motion [53] is DENIED.

### VI.   Scurry Motion for Bill of Particulars [54]

#### a.   Background

Scurry moves for a bill of particulars setting forth various facts, including, the date on which the grand jury was initially summoned and the date of any court order extending the Grand Jury's service; the earliest event or statement upon which the prosecution plans to rely to establish the existence of the conspiracy; the "nature of any all [sic] statements and/or events upon which the prosecution intends to rely to prove that the conspiracy existed" along with the same facts with respect to Scurry's involvement; the locations where the conspiracy is alleged to have occurred; the identities of the unindicted co-conspirators known to the Grand Jury; the overt acts upon which the government "may rely" at trial; the transactions providing the basis for the allegation that the conspiracy involved 500 or more grams of cocaine[13] and 280 grams or more of cocaine base; and the "manner and means of the conspiracy."   Def. Scurry's Mot. Bill

---

[13] After the filing of Scurry's motion on October 14, 2011, a Third Superseding Indictment was issued by the grand jury and filed on December 16, 2011.  That Indictment charges the defendants with conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine, rather than the amount initially charged.  Third Superseding Indictment at 2.

Particulars 1–2, ECF No. 54.  Scurry also notes that, at the time of his motion, he had not been charged with any substantive offense.[14]

### b.  Legal Standard

Criminal defendants may move for a bill of particulars within fourteen days of arraignment or at a later time if the court permits.  Fed. R. Crim. P. 7(f).  Districts courts may order the government to file a bill of particulars and the trial court's determination of whether a bill of particulars is necessary "rests within the sound discretion of the trial court" and will not be disturbed absent an abuse of discretion. *Id.*; *United States v. Mejia*, 448 F.3d 436, 445 (D.C. Cir. 2006) (citation omitted).  A bill of particulars serves to ensure that charges against a defendant are stated with sufficient particularity to permit the defendant to "understand the charges, to prepare a defense, and perhaps also to be protected against retrial on the same charges." *United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987); *United States v. Esquivel*, 755 F. Supp. 434, 436 (D.D.C. 1990).  However, a bill of particulars is not to be used as "a discovery tool or a devise for allowing the defense to preview the government's theories or evidence.  It properly includes clarification of the indictment, not the government's proof of its case." *United States v. Ramirez*, 54 F. Supp. 2d 25, 29 (1999).  Also, if the requested information is "available in some other form, then a bill of particulars is not required." *Butler*, 822 F.2d at 1193.

### c.  Scurry Not Entitled to a Bill of Particulars

The government has already provided Mr. Scurry with extensive information, including discovery, pleadings, and the government's Omnibus Response to Defendant's Legal Motions. Gov't Omnibus Resp. Defs.' Mots. 104–05, ECF No. 109.  This information should allow Scurry to adequately prepare his defense against the charges he faces.  The government reports that it

---

[14] The Third Superseding Indictment outlined an additional 19 counts against Scurry, including unlawful distribution of cocaine base, and provided the dates upon which the alleged offenses took place.

has provided Scurry with details of nine controlled buys forming the basis of his wire interceptions and that Scurry's counsel has reviewed audio and video recordings of these buys. *Id.* Scurry has also been provided with copies of all calls intercepted on his line, supporting documentation, a summary of testimonial evidence the government anticipates sponsoring into evidence detailing Scurry's crack cocaine sales and surveillance of his activities. *Id.* Finally, the government notes its intention to use evidence seized pursuant to a search of his home on November 10, 2010, including cocaine base found in the pocket of a pair of pants allegedly belonging to Scurry. *Id.* at 105.

The government argues that it has no obligation to file a bill of particulars detailing facts regarding the existence and formation of the conspiracy, *id.* at 106 (citing *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 1986), or to specify every overt act of the conspiracy that it plans to prove at trial, *id.* (citing *Wong Tai v. United States*, 273 U.S. 77, 81 (1927)), or to disclose "specific information about the times and places that [the defendant] participated in the alleged conspiracy. . . ." *Id.* (citing *Butler*, 822 F.2d at 1194). It argues that where extensive discovery has already been provided to defendants, a bill of particulars is unnecessary. *Id.* (citing *United States v. Harmon*, 251 F.2d 379, 380 (D.C. Cir. 1958); *United States v. Eiland*, 2006 WL 516743, *7 (D.D.C. 2006). Additionally, it suggests that its omnibus response to the defendants' motions provides sufficient additional information regarding the allegations to warrant denial of the motion for the bill of particulars. *Id.* (citing *United States v. Butler*, 822 F.2d 1191, 1193–94 (D.C. Cir. 1987) (upholding district court's denial of bill of particulars when additional information provided in opposition to motion for bill of particulars furnished defendant with information requested).

Given the foregoing discussion and the government's assurances that Scurry has already received all information to which he is entitled, Scurry's Motion [54] for a bill of particulars is DENIED.

## VII.   Scurry Request for Notice Prior to Trial of Government's Intention to Present Evidence Pursuant to 404(b) [55]

### a.  Background

Scurry asks this Court to order the government to notify him of any intention to present evidence under Fed. R. Evid. 404(b).  Def. Scurry's Req. Notice 404(b) 1, ECF No. 55.  At the time he filed the motion, Scurry had not yet been charged with substantive offenses for, among other things, the controlled buys in which he was allegedly involved.  Scurry requests that the government be ordered to disclose its intention to introduce evidence of these buys and any other crimes at trial, as well as the theory upon which the alleged acts are admissible.

### b.  Scurry Not Entitled to Additional Pre-Trial Notice Regarding 404(b) Evidence

Evidence of a defendant's character or character traits is inadmissible to show that the defendant acted in conformity with that character or trait on a particular occasion.  Fed. R. Evid. 404(a).  However, Fed. R. Evid. 404(b) allows the admission of evidence of a "crime, wrong, or other act" for other purposes, including to show opportunity, preparation, plan, knowledge, absence of mistake, etc.  Fed. R. Evid. 404(b)(2).  At the request of a defendant, the government must provide before trial, unless good cause is shown, "reasonable notice of the general nature" of any such evidence the prosecution plans to offer at trial.  Fed. R. Evid. 404(b)(2)(B).

In response to Scurry's request, the government responds that it has put the defense on notice, through its Notice of Intrinsic Evidence, Gov't Notice Intrinsic Evid., ECF No. 69, of the nature and breadth of the evidence it intends to introduce to prove the existence of the conspiracy and the defendants' participation in it beyond a reasonable doubt.  Gov't Omnibus Resp. Defs.' Mots. 115, ECF No. 109.  The government contends that all of the evidence detailed in the Notice of Intrinsic Evidence, with the exception of certain certified convictions, is proof of the conspiracy and falls outside of the requirements of Rule 404(b).  *Id.*; *see also United States v. Williams*, 900 F.2d 823 (5th Cir. 1990) (noting the distinction between intrinsic offense evidence and 404(b) evidence).  The government also notes that, in addition to the specific facts set forth in the Notice, it has provided the defendants with Title III and search warrant affidavits, as well as DEA reports of controlled substance analysis for evidence seized during the course of the investigation.  Gov't Omnibus Resp. 115 n.35.  With respect to defendant Scurry, in particular, the government has provided extensive discovery, including information and evidence regarding the controlled buys in which he was involved.  *Id.* at 104–05.  The government argues that the evidence summarized in all the Notice of Intrinsic Evidence constitutes direct evidence of the conspiracy and is admissible at trial.  Finally, the government has stated its intention to provide supplemental written notice to the Court and the parties should it become aware of additional evidence which may be introduced at trial.  *Id.* at 115.

To the extent that Scurry is requesting any additional notice, this Motion [55] is DENIED.

## VIII.   Brown Request for Preservation of Electronic Mail [60]

### a.   Background

Brown requests that the court order the government, including its investigative agencies, to preserve electronic mail and text messages made in connection with the investigation and prosecution of this case.  Def. Brown's Mot. Preserv. Elec. Mail 1, ECF No. 60.  Brown appears to be concerned solely with preservation of witness statements that the government may be required to provide pursuant to the Jencks Act (18 U.S.C. § 3500).  Brown's Mot. 1.  Brown argues that electronic mail and texts, presumably written by government witnesses, should be considered "statements" within the meaning of the Jencks Act and that the government should be ordered to preserve them.

### b.  The Court Need Not Order Government to Preserve Mail

The Court need not decide prior to the trial whether electronic mail and texts sent by government witnesses during the course of the investigation and prosecution of this case are "statements" for the purposes of the Jencks Act.  The United States is aware of and notes its intention to fully comply with its obligations under the Jencks Act for every witness it calls.  Gov't Omnibus Resp. Defs.' Mots. 115, ECF. No. 109.  To alleviate Brown's concern that government investigators may have or might destroy their electronic mail, the Government has requested that agents preserve electronic mail relating to this investigation.  *Id.* at 116 n.36.

Given the fact that the government reports its compliance with the proposed motion, the Motion [60] is DENIED as moot.


### IX.  Scurry Motion for Discovery of Detector Dog Information [70]

Scurry requests an order compelling the government to provide extensive information regarding two detector dogs used during a search of his GMC Denali.  Def. Scurry's Mot. Disc. Detector Dog Information 1, ECF No. 70.  During the search, the dogs alerted at "several" areas

in the vehicle, but agents did not recover any drugs from the vehicle.  Gov't Omnibus Resp.

Defs.' Mots. 114, ECF No. 109.  Scurry argues that because the dogs alerted, the dogs' reliability

is at issue and he needs the requested information to prepare for cross-examination of the agents

who searched the Denali.  Scurry's Mot. 3–4.

The government asserts that, while it may present testimony from these agents, it does

not anticipate the presentation of evidence regarding the dog sniffs.  Gov't Omnibus Resp. 114.

Since the government has not proffered that it will use the dog sniffs to indicate that

drugs had been present in Scurry's vehicle, the Motion [70] is DENIED.


**X.**     **Government's Motion to Impeach Defendants with Prior Convictions Pursuant**
           **to Rule 609 [68]**

   **a.  Background**

The government asks the Court, pursuant to FRE 609(a)(1), to allow the introduction of

prior convictions of defendants Hudson and Robinson for impeachment purposes should they

testify at trial.  Gov't Mot. Impeach 1, ECF. No. 68.  Specifically, the government appears to

seek to introduce Hudson's June 2007 conviction for Carrying a Pistol Without a License[15] and

Robinson's December 2009 conviction for Distribution of Controlled Substance—Cocaine.

Both defendants are charged with Conspiracy to Distribute and Possess with Intent to Distribute

5 Kilograms or More of Cocaine and 280 Grams or More of Cocaine Base, in violation of 21

---

[15] The government's motion also lists the following June 2007 misdemeanor convictions of Hudson as "pertinent":
Possession Controlled Substance—Cocaine, Possession Controlled Substance—Marijuana, and Possession
Controlled Substance—Ecstasy.  Mot. Impeach 2.  It is unclear if the government asks this Court to permit the
introduction of these convictions.  Fed. R. Evid. 609(a)(1)(B), relating to convictions punishable by imprisonment
over one year, seems to be the only provision discussed by the government in its motion.  To the extent that the
misdemeanor convictions listed in the Motion are punishable by imprisonment of less than one year, they will not be
admissible under Fed. R. Evid. 609(a)(1)(B).

U.S.C. § 846.  Mot. Impeach 1.  Hudson is also charged with Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c).

### b.  <u>Legal Standard</u>

Pre-trial determination of impeachment questions is generally preferable so that the parties may make strategic decisions accordingly.  *United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980).  Fed. R. Evid. 609(a)(1)(B) provides that evidence of a criminal conviction for a crime punishable by imprisonment for more than one year must be admitted in a criminal case in which the witness is a defendant "if the probative value of the evidence outweighs its prejudicial effect to that defendant."  Fed. R. Evid. 609(a)(2) allows the introduction of convictions involving dishonest acts or false statements regardless of the length of the associated punishment.  The factors relevant to a 609(a)(1)(B) determination of whether the probative value of the conviction outweighs its prejudicial effect include, but are not limited to, "the nature of the crime, the time of the conviction, the similarity of the past crime to the charged crime, the importance of the defendant's testimony, and the degree to which the defendant's credibility is central to the case."  *Jackson*, 627 F.2d at 1209.

The analysis involves a "careful[] and thoughtful[]" balancing that does not "lead[] inexorably to admitting the prior conviction into evidence."  *United States v. Lipscomb*, 702 F.2d 1049, 1063 (D.C. Cir. 1983).  While Fed. R. Evid. 609(a) "stresses admissibility" when compared with 609(b), *United States v. Lewis*, 626 F.2d 940, 950 (D.C. Cir. 1980), there is no "presumption" that prior convictions are admissible.  *Lipscomb*, 702 F.2d at 1063 & n.54. Nevertheless if the trial judge "explicitly balances probative value and prejudicial effect, his decision will be reviewed only for an abuse of discretion."  *Lewis*, 626 F.2d at 950.

Although a hearing on the matter is not necessary, "some inquiry into the nature and circumstances of a prior conviction is a prerequisite to its admissibility under 609(a)." *United States v. Crawford*, 613 F.2d 1045, 1053 (D.C. Cir. 1979).  This requirement may be satisfied by an inquiry into whether the prior conviction was a felony punishable by imprisonment over one year, the type of charge, and the length of time between the conviction and the trial date.  *See United States v. Lewis*, 626 F.2d 940, 949 n.12 (D.C. Cir. 1980) (noting that the trial judge had "satisfactorily anticipated" the need for an inquiry into the nature and circumstances of the prior conviction by considering these factors).

With respect to the probative value of a felony conviction, the D.C. Circuit has held that all felony convictions less than ten years old have "at least some probative value" and that it is in the trial court's discretion whether additional information is needed regarding the circumstances surrounding the conviction.  *Lipscomb*, 702 F.2d at 1056.  However, the Circuit has also suggested that some felony convictions will have more bearing on a witness's credibility than others.  For example, in *Lipscomb*, the court noted that a prior conviction of robbery, because it involved theft and was a "serious crime that shows conscious disregard for the rights of others" reflected "more strongly on credibility than . . . [for example,] simple narcotics or weapons possession."  702 F.2d at 1071.

Conviction for a prior charge when a defendant is facing pending similar charges may be prejudicial, *see Lewis*, 626 F.2d at 951, and the D.C. Circuit has noted that "convictions which are for the same crime should be admitted sparingly."  *Gordon v. United States*, 383 F.2d 936, 940 (D.C. Cir. 1967).  However, the probative value of convictions for prior similar charges may outweigh their prejudicial effect if, for example, the defendant denies any prior involvement in or knowledge of the type of criminal activity at issue.  *Id.*  Additionally, the D.C. Circuit has upheld

the admission of convictions for similar offenses to those for which the defendant is being tried. In *Lewis*, the D.C. Circuit reviewed for abuse of discretion a trial court determination to admit prior drug-related convictions.  After the trial court's decision, the defendant in that case testified and denied ever having seen pills like the ones at issue and "tried to convince the jury that he was a relative stranger to the use and sale of illegal drugs."  *Lewis*, 626 F.2d at 947.  Given these denials, the fact that the defendant would be the "only witness [for the defense]," and that the government witness testimony would be in conflict with the defendant's testimony, the Circuit held that "the [trial court] judge's decision to admit evidence of the prior conviction was a reasonable response to the conflict in testimony.  Where such conflict exists, it is of prime importance that the jury be given as much help in determining credibility as the Rules of Evidence permit."  *Lewis*, 626 F.2d at 950.

### c.  Application and Conclusion

The convictions apparently offered by the government, Hudson's June 2007 conviction for Carrying a Pistol Without a License and Robinson's December 2009 conviction for Distribution of Controlled Substance—Cocaine, appear to each be punishable by imprisonment of more than one year and to have occurred within the last ten years.  Facially, the prior felony convictions of Hudson and Robinson would appear to be admissible to allow the jury to weigh the credibility of these defendants should they choose to testify.  However, a final determination on this matter will be made at trial.

## XI.  Conclusion

In light of the foregoing, this case shall proceed to trial on all counts alleged in the indictment.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on September 5, 2012.